1  BARRY J. PORTMAN
   Federal Public Defender
2  NED SMOCK
   Assistant Federal Public Defender
3  555 - 12th Street
   Suite 650
4  Oakland, CA 94607-3627
   Telephone: (510) 637-3500
5
   Counsel for Defendant BACA
6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,          )    No. CR-07-0659 DLJ
                                       )
12                  Plaintiff,         )    **DEFENDANT'S MOTION TO**
                                       )    **SUPPRESS**
13  vs.                                )
                                       )
14  ERNEST PASCUAL BACA,               )    Date:   September 5, 2008
                                       )    Time:   11:00 a.m.
15                  Defendant.         )    Judge:  Hon. D. Lowell Jensen
    _____ )

16

17     TO:    THE UNITED STATES OF AMERICA, PLAINTIFF; AND JOSEPH P.
              RUSSONIELLO, UNITED STATES ATTORNEY; AND WADE RHYNE,
18            ASSISTANT UNITED STATES ATTORNEY

19        PLEASE TAKE NOTICE that on September 5, 2008, at 11:00 a.m., defendant

20  Ernest Pascual Baca will, and hereby does, move this court for an order granting his motion

21  to suppress all evidence seized and statements made on August 2, 2007, as a result of his

22  seizure and the subsequent search of his vehicle.

23        The motion is based on this notice and motion, the following memorandum of points

24  and authorities and accompanying exhibits, the Fourth and Fifth Amendments to the United

25  States Constitution, all other applicable constitutional, statutory and case authority, and such

26  evidence and argument as may be presented at the hearing of this motion.

DEF. MOTION TO SUPPRESS              1

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    Factual Background**

On August 2, 2007, Fremont Police officers arrested Ernest Baca after locating firearms in the vehicle they had seen him driving.  What follows is a summary of the events surrounding the arrest and search of Mr. Baca.  This summary is drawn from a declaration by Mr. Baca as well as police reports provided in discovery.  Mr. Baca does not concede the accuracy of these reports.

At approximately 1:32 a.m. on August 2, 2007, Fremont Police Officer Armando Magana, who was driving in a marked patrol car, noticed a green Toyota Corolla stopped at a stop sign for what he perceived to be a long time.  *Exhibit A, Report of Officer Magana* at 0014.  After the vehicle turned, Officer Magana ran a check on its license plate which came back clear and valid.  The vehicle pulled to the side of the road and parked about 50 yards north of Mowry Avenue.  Ernest Baca got out of the driver side and began walking toward the sidewalk.  *Id.*

Officer Magana believed that he recognized Mr. Baca from a previous contact.  He stopped his vehicle, rolled down the window, and asked Mr. Baca if he was related to Greg Lopez.  The officer then asked what Mr. Baca's name was, and Mr. Baca said that his name was Chris Baca.  When asked, Mr. Baca said that he had a valid drivers license and was not on probation.  He reported that he was going to visit his girlfriend, Ana Cueva, at the corner of Mowry and Glenview.  Officer Magana ended the contact and drove away.  *Id.*

Officer Magana reports that as he drove off, he remembered that the person he had just spoken with was Ernie Baca and he believed that Mr. Baca was a gang member.  Officer Magana turned around and drove back to find Mr. Baca.  Several minutes after the first contact, Officer Magana encountered Mr. Baca at the northeast corner of Mowry Avenue and Glenview.  He got out of his vehicle, approached Mr. Baca, and confronted him about his name.  Mr. Baca maintained that his first name was Chris.  When Officer Magana

1    insisted that he recognized Mr. Baca to be Ernie Baca, Mr. Baca relented.  Officer Magana

2    requested backup, and Officer Travis Macdonald arrived at the scene.  *Id.*

3        Officer Magana ran a record check on Mr. Baca and learned that he was on parole for

4    violation of California Penal Code § 212.5(c) and that his drivers license was suspended.

5    Officer Magana searched Mr. Baca and did not find anything.  Officer Magana reports

6    noticing during this search that Mr. Baca did not have car keys with him.  *Id.*

7        Officer Magana then kept Mr. Baca detained for more than one and a half hours

8    while he tried to enter and search the Toyota Corolla.  *Exhibit B, Detailed History for Police*

9    *Call* at 0180.  Officer Magana had Mr. Baca sit on the curb and questioned him at length

10    about where the keys to the vehicle were and where he had been earlier that night.  *Exhibit*

11    *C, Declaration of Ernest Baca* at ¶ 2.  According to Officer Magana, Mr. Baca said that he

12    had gone out to dinner at Denny's with Ms. Cueva, and that he had returned to her home

13    because he left his cell phone in her car.  Mr. Baca reported that he gave the keys to the

14    Corolla to Ana and that he planned on leaving the car with Ms. Cueva because her family

15    was interested in buying the car.  *Exh. A* at 0015.  Officer Magana reports that he began to

16    believe that the Corolla might be stolen.  Officer Macdonald kept Mr. Baca detained as

17    Officer Magana went to speak with Ana Cueva.  Ms. Cueva confirmed that she and Mr.

18    Baca had been at Denny's earlier, but reported that she did not have the keys to the car.  *Id.*

19        Officer Magana called the Sisters of the Holy Family Convent, which was the

20    registered owner of the vehicle.  He learned that Mr. Baca's mother worked at the convent

21    and that the vehicle was not stolen.  Officer Magana then placed Mr. Baca under arrest for

22    violation of California Penal Code § 148.9, which makes it a misdemeanor to falsely

23    represent oneself to a peace officer upon a lawful detention or arrest, and for driving with a

24    suspended license pursuant to California Vehicle Code § 14601.  *Id.*  This process took a

25    long time.  The initial contact with Mr. Baca occurred at about 1:32 a.m.  It was not until

26    approximately 2:42 a.m. that officers called for a tow truck.  *Exh. B.*

1    Officer Magana claims that before the tow truck arrived, he saw what appeared to be

2    the keys to the car on the driver's side floor board.  He also reports having seen what

3    appeared to be the handle of a handgun underneath the passenger seat.  *Exh. A* at 0015.  A

4    tow truck arrived and the driver unlocked the rear driver side door.  Officer Lambert, a K-9

5    officer, arrived with his dog to assist in the search of the vehicle.  Officer Magana claims

6    that he searched the car and found a handgun under the passenger seat.  He reports that the

7    dog then searched the car and indicated the odor of narcotics in the area of the center

8    console, where officers found a bottle with a clear bag containing a small amount of

9    methamphetamine.  *Id.*  In the trunk, Officer Magana located three rifles and three shotguns

10    in boxes.

11    Mr. Baca remembers the events leading up to the warrantless search of the vehicle

12    and the search itself differently.  Specifically, it was clear to Mr. Baca based on Officer

13    Magana's behavior that he *did not* see the handgun until he entered the vehicle.  While he

14    waited for the tow truck to arrive, Officer Magana looked for the keys to the car.  He looked

15    into the windows of the car with a flashlight several times and also looked into the bushes,

16    over a fence, and across the street.  *Exh. C* at ¶2.  Although he kept speaking with Mr. Baca

17    and asking where the keys were, he never mentioned seeing the keys or a gun inside the

18    vehicle.  *Id.* at ¶3.  Once the tow truck driver arrived, the officers on scene sent him back to

19    get a slim jim to open up the locked vehicle.  *Id.*  The tow truck driver returned and was able

20    to open one of the doors to the vehicle.  Instead of entering and searching the vehicle at this

21    time, the officers waited for a canine unit to arrive.  *Id.* at ¶4.  Once Officer Lambert arrived

22    with his dog at approximately 3:07 a.m., he went into the vehicle and located a pill bottle

23    containing a small amount of methamphetamine, then went back into the vehicle and pulled

24    out a handgun.  It was not until after Officer Lambert found these items that Officer Magana

25    entered the vehicle.  *Id.*

26

DEF. MOTION TO SUPPRESS                    4

## II.    **Argument**

### I.    **The Fruits of the Warrantless Arrest and Search of Mr. Baca Must Be Suppressed**

Because the stop and arrest of Mr. Baca occurred without benefit of a warrant, the stop, arrest and search were presumptively illegal. *See United States v. Katz*, 389 U.S. 347 (1976). The Fourth Amendment protects people from "unreasonable searches and seizures." U.S. Const. amend. IV. The Amendment establishes a strong preference for searches and seizures pursuant to a warrant. *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few limited exceptions. *Id.*; *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001). The government bears the burden of establishing that a warrantless search or seizure does not violate the Fourth Amendment. *Hawkins*, 249 F.3d at 872; *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988).

#### A.    **The Government Must Justify the Initial Seizure of Mr. Baca**

The Fourth Amendment requires that police have reasonable, articulable suspicion that "criminal activity is afoot" before stopping a citizen. *Minnesota v. Dickerson*, 508 U.S. 366, 371 (1993)(citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion is more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry,* 392 U.S. at 27. Moreover, an individual's presence in an area of expected criminal activity, by itself, does not give rise to reasonable suspicion. *Brown v. Texas,* 443 U.S. 47, 52 (1979). "Innocuous conduct does not justify an investigatory stop unless there is other information or surrounding circumstances of which the police are aware." *United States v. Montero-Camargo*, 208 F.3d 1122, 1130 (9th Cir. 2000)(citing *People of the Territory of Guam v. Ichiyasu*, 838 F.2d 353, 355 (9th Cir. 1988)). The burden to provide sufficient facts in support of reasonable suspicion falls squarely upon the United States. *See Brown*, 443 U.S. at 51-52; *Florida v. Royer*, 460 U.S. 491, 500 (1983)(plurality opinion). A Fourth

1   Amendment seizure occurs when an officer intentionally applies physical restraint of a

2   suspect or initiates a show of authority to which a reasonable innocent person would feel

3   compelled submit, and to which the subject does submit for reasons that are solely related to

4   the official show of authority. *California v. Hodari D.*, 499 U.S. 621, 624 (1991); *Florida*

5   *v. Bostick*, 501 U.S. 429, 436-37 (1991).

6          Here, Mr. Baca was detained once the officer approached him for a second time and

7   questioned him repeatedly and insistently about his true identity. This detention occurred in

8   the absence of any articulable suspicion that Mr. Baca had committed a crime. In his report,

9   Officer Magana does not refer to any California statute making it illegal to provide a false

10  name to a peace officer when asked casually by an officer from his police cruiser. Officer

11  Magana can cite to nothing more than his suspicion that Mr. Baca did not accurately identify

12  himself as a basis to return and detain Mr. Baca to inquire further about his identity.

13  Accordingly, the detention was illegal and all evidence obtained as a result of that detention

14  must be suppressed.

15         Officer Magana implicitly conceded in his report that he detained Mr. Baca at the

16  time he approached Mr. Baca for a second time. According to Officer Magana, Mr. Baca's

17  repeated claim that his name was Chris, rather than Ernest, amounted to a violation of

18  California Penal Code § 148.9. That statute reads as follows:

19         Any person who falsely represents or identifies himself or herself as another
           person or as a fictitious person to any peace officer. . . . upon a lawful detention or
20         arrest of the person, either to evade the process of the court, or to evade the proper
           identification of the person by the investigating officer is guilty of a misdemeanor.
21

22  Cal. Penal Code §148.9. Of particular relevance to this case is the requirement that the

23  charged individual have been either lawfully detained or arrested at the time the false

24  identity is provided to law enforcement. It is not a violation of § 148.9 to give false identity

25  information during a consensual encounter with the police. *In re Voeurn O.*, 35 Cal.App.4th

26  793, 795-797 (1995). Therefore, Officer Magana necessarily believed that Mr. Baca was

DEF. MOTION TO SUPPRESS              6

1    detained at the time he provided a false name.  If Mr. Baca was not detained at the time he

2    provided a false name, there was no basis to arrest him for violation of Penal Code § 148.9.

3
     **B.    It is the Government's Burden to Establish an Exception to the Warrant
           Requirement to Justify the Vehicle Search**

4
    "It is well settled under the Fourth and Fourteenth Amendments that a search

5    conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject

6    only to a few specifically established and well-delineated exceptions.'" *Schneckloth v.*

7    *Bustamonte*, 412 U.S. 218, 219 (1973)(citing *Katz v. United States*, 389 U.S. 347, 357

8    (1967); *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971).  The search of an

9    automobile must be supported by probable cause unless some other Fourth Amendment

10   exception applies.  *Chambers v.  Maroney*, 399 U.S. 42, 51 (1970).

11
    Here, the Fremont police officers had no warrant to enter or search Mr. Baca's

12   legally parked vehicle.  The search was therefore presumptively illegal.  *See Katz*, 389 U.S.

13   347.  "Any exception to the Fourth Amendment warrant requirement must be proven by a

14   preponderance of evidence, *and this burden is upon the government*."  *United States v. Linn*,

15   880 F.2d 209, 214 (9th Cir. 1989) (emphasis added).  If the government fails to meet this

16   burden, all evidence flowing from the warrantless search must be suppressed.

17

18        **C.    Mr. Baca's Statements Were Obtained in Violation of the Fifth
           Amendment and Must Be Suppressed**

19       Mr. Baca was illegally interrogated while he was detained.  The government may not

20   use any statements obtained as a result of custodial interrogation unless it establishes that the

21   police first advised the person questioned of his rights.  *Miranda v. Arizona*, 384 U.S. 436,

22   444 (1966); *United States v. Nieblas*, 115 F.3d 703, 705 (9th Cir. 1997).  These rights must

23   be given before in-custody questioning begins.  *Texas v. Cobb*, 532 U.S. 162 (2001).  As the

24   Supreme Court has noted, *Miranda* warnings are "not simply a preliminary ritual to existing

25   methods of interrogation, " but instead referenced "rights grounded in a specific requirement

26   of the United States Constitution."  *Dickerson v. United States*, 530 U.S. 428, 439 n.4

1  (quotations omitted) (2000).   The government bears the burden of establishing that the

2  person was advised of his rights.  *United States v. Cazares*, 121 F.3d 1241, 1243-44 (9th

3  Cir. 1997).  "Unless the prosecution can demonstrate the warnings and waiver as threshold

4  matters . . . it may not overcome an objection to the use at trial of statements obtained from

5  the person in any ensuing custodial interrogation."  *Withrow v. Williams*, 507 U.S. 680, 690

6  (1993).  The doctrine of *Miranda* must be "enforced strictly."  *Illinois v. Perkins,* 496 U.S.

7  292, 297 (1990).

8              **i.        Mr. Baca was in Custody**

9        A person is in custody for purposes of *Miranda* if he has been "deprived of his

10 freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  The key question in

11 determining whether a person is in custody is, "given those circumstances, would a

12 reasonable person have felt he or she was not at liberty to terminate the interrogation and

13 leave[?]"  *Thompson v. Keohane*, 516 U.S. 99, 110 (1995).  A person is in custody for

14 *Miranda* purposes if, under all the objective circumstances, "there was a formal arrest or

15 restraint on freedom of movement of the degree associated with a formal arrest."  *Stansbury*

16 *v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks and brackets omitted).

17 Relevant  factors include "the language used by the officers, the physical characteristics of

18 the place where the questioning occurs, the degree of pressure applied to detain the

19 individual, the duration of the detention, and the extent to which the person was confronted

20 with evidence of guilt."  *United States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001)

21 (citation omitted).

22       Here, Mr. Baca was unquestionably in custody while he was questioned about his

23 whereabouts that evening and the location of the keys to the Toyota Corolla.  Officer

24 Magana had been told that Mr. Baca was on parole and that he had a suspended drivers

25 license.  As set forth above, since Officer Magana believed Mr. Baca had violated California

26

Penal Code § 148.9, it must be assumed Officer Magana believed Mr. Baca was detained.
Officer Magana clearly intended to search the vehicle and was not going to let Mr. Baca
leave until he had done so. Mr. Baca had been told to sit on the curb and was being watched
by at least two officers. Exh. C at ¶2. It is undeniable that Mr. Baca was not free to leave.
Indeed, Officer Magana held Mr. Baca at the scene for more than an hour while Officer
Magana investigated the vehicle.

### ii.    Mr. Baca was Subject to Custodial Interrogation

Interrogation occurs upon "express questioning" by the police or if police use "any
words or actions . . . [that they] should know are reasonably likely to elicit an incriminating
response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes
omitted). Mr. Baca was interrogated. Government agents expressly asked him detailed
questions about where he had been that night, when he had been driving the Toyota Corolla,
and where the keys for the vehicle were. These questions were asked of Mr. Baca before he
was *Mirandized*. Any answers to these questions were likely to be incriminating. Thus, Mr.
Baca was subject to custodial interrogation.

### iii.    Mr. Baca's Statement Must Be Suppressed

The remedy for a violation of *Miranda* is suppression of the unwarned statements.

> Failure to administer *Miranda* warnings creates a presumption of
> compulsion. Consequently, unwarned statements that are otherwise
> voluntary within the meaning of the Fifth Amendment must
> nonetheless be excluded from evidence under *Miranda*.

*Oregon v. Elstad*, 470 U.S. 298, 307 (1985). The presumption is not rebuttable for purposes
of admission of the statements in the government's case-in-chief. *Id.; see also United States
v. Henley*, 984 F.2d 1040, 1043 (9th Cir. 1993) ("*Miranda* presumes conclusively that all
responses to custodial interrogation are involuntary unless preceded by the prescribed
warnings"). This "bright-line" legal presumption of coercion requires suppression of all

unwarned statements.  *Id.* at 306 n.1.  Thus, the Court should suppress Mr. Baca's statements made to law enforcement beginning when he acknowledged his true name, since his custodial interrogation violated the Fifth Amendment.

**III.    Conclusion**

For the foregoing reasons, this Court should suppress all evidence recovered in the search of the Toyota Corolla, as well as the statements made by Mr. Baca while he was in custody.

Dated: August 8, 2008

Respectfully submitted,

BARRY J. PORTMAN
Federal Public Defender

/S/ Ned Smock

NED SMOCK
Assistant Federal Public Defender