1   JOSEPH P. RUSSONIELLO (CABN 44332)
    United States Attorney
2
    BRIAN J. STRETCH (CABN 163973)
3   Chief, Criminal Division

4   WADE M. RHYNE (CABN 216799)
    Assistant United States Attorney
5
        1301 Clay Street, Suite 340-S
6       Oakland, California 94612
        Telephone: (510) 637-3680
7       Facsimile: (510) 637-3724
        E-Mail:    wade.rhyne@usdoj.gov
8

9   Attorneys for Plaintiff

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                       OAKLAND DIVISION

13  UNITED STATES OF AMERICA,        )    No. CR-07-0659 DLJ
                                     )
14          Plaintiff,               )    UNITED STATES' RESPONSE IN
                                     )    OPPOSITION TO DEFENDANT ERNEST
15      v.                           )    PASCUAL BACA'S MOTION TO
                                     )    SUPPRESS
16  ERNEST PASCUAL BACA,             )
                                     )    Date:      September 26, 2008
17          Defendant.               )    Time:      11:00 a.m.
                                     )    Judge:     Hon. D. Lowell Jensen
18  _____)

19

20

21      The United States of America, by and through its undersigned counsel, hereby submits

22  this Memorandum in Opposition to Defendant Ernest Pascual Baca's motion to suppress.[1]  The

23  United States bases its opposition on the attached Memorandum of Points and Authorities; the

24  Declarations of Fremont Police Officers Armando Magana and Jason Lambert; the files and

25  records in this case; and any further evidence or argument as may be presented at the

26  ///

27  ///

28  ─────────────────────────
        [1]Docket No. 35.
    UNITED STATES' OPP. TO DEF.'S MOT. TO SUPPRESS
    CR-07-0659 DLJ                            1

1    hearing on the motion.

2                                    Respectfully submitted,

3                                    JOSEPH P. RUSSONIELLO
                                     United States Attorney
4

5    DATED: September 5, 2008

6                                    _____
                                     WADE M. RHYNE
7                                    Assistant United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    JOSEPH P. RUSSONIELLO (CABN 44332)
     United States Attorney

2

3    BRIAN J. STRETCH (CABN 163973)
     Chief, Criminal Division

4    WADE M. RHYNE (CABN 216799)
     Assistant United States Attorney

5
     1301 Clay Street, Suite 340-S
6    Oakland, California 94612
     Telephone: (510) 637-3680
7    Facsimile: (510) 637-3724
     E-Mail:    wade.rhyne@usdoj.gov

8

9    Attorneys for Plaintiff

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                       OAKLAND DIVISION

13   UNITED STATES OF AMERICA,          )    No. CR-07-0659 DLJ
                                        )
14        Plaintiff,                    )    UNITED STATES' RESPONSE IN
                                        )    OPPOSITION TO DEFENDANT ERNEST
15   v.                                 )    PASCUAL BACA'S MOTION TO
                                        )    SUPPRESS
16   ERNEST PASCUAL BACA,               )
                                        )    Date:       September 26, 2008
17        Defendant.                    )    Time:       11:00 a.m.
                                        )    Judge:      Hon. D. Lowell Jensen
18   _____)

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    I.    Defendant Was Not Actually Detained Until the
        Officer Formally Arrested Him. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    II.    Even if the Court Finds That Defendant was Detained
        During the Second Encounter, There was Reasonable
        Suspicion to Support the Detention. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    III.    The Search of Defendant's Car was Constitutional on
        Multiple Grounds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.    The Search of Defendant's Car was a Permissible
              Parole Search. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.    The Search of Defendant's Car was a Permissible
              Inventory Search . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.    The Officers Would Have Inevitably Discovered
              Defendant's Methamphetamine and Firearms Once
              Defendant's Car Was Actually Impounded . . . . . . . . . . . . . . . . . . . . 17

    IV.    The Officers Did Not Obtain Defendant's Statements in
        Violation of the Fifth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        A.    Defendant was Not in "Custody" for Purposes of Miranda
              Until He was Formally Arrested . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        B.    The Officers Did Not "Interrogate" Defendant for Purposes
              of Miranda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

i

## TABLE OF AUTHORITIES

*Berkemer v. McCarty*, 468 U.S. 420, 442 & n. 35 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dunaway v. New York*, 442 U.S. 200, 212-16 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Fitzgerald v. City of Los Angeles*, 485 F. Supp. 2d 1137, 1142 (C.D. Cal. 2007) . . . . . . . . . . . 18

*Florida v. Bostick*, 501 U.S. 429, 439 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Florida v. Royer*, 460 U.S. 491, 497 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hayes v. Florida*, 470 U.S. 811, 815-16 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Henry v. United States*, 361 U.S. 98, 102 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*INS v. Delgado*, 466 U.S. 210, 216 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Michigan v. Chesternut*, 486 U.S. 567, 574-76 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Miranda v. Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Moreno v. Baca*, 431 F.3d 633, 643 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Nix v. Williams*, 467 U.S. 431, 444, 447 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Pennsylvania v. Muniz*, 496 U.S. 582 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Samson v. California*, 547 U.S. 843 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*South Dakota v. Opperman*, 428 U.S. 364, 376 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 15, 17

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Booth,* 669 F.2d 1231, 1238 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Christian,* 356 F.3d 1103, 1106 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Cortez,* 449 U.S. 411, 418 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Crisco,* 725 F.2d 1228, 1231 (9th Cir.), cert. denied, 466 U.S. 977 (1984) . . . 21

*United States v. Erwin,* 803 F.2d 1505, 1508 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Foster,* 227 F.3d 1096, 1102-03 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Kim,* 25 F.3d 1426, 1430 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Malone,* 886 F.2d 1162, 1164 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Mancera-Londono,* 912 F.2d 373, 375 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . 20

*United States v. Mendenhall,* 446 U.S. 544, 554 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Penn,* 233 F.3d 1111 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Sharpe,* 470 U.S. 675, 685 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Sokolow,* 490 U.S. 1, 7 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*United States v. Washington,* 462 F.3d 1124, 1131 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 22

*United States. v. Magana,* 2007 WL 2384778 at *2 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . 14

1  JOSEPH P. RUSSONIELLO (CABN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CABN 163973)
3  Chief, Criminal Division

4  WADE M. RHYNE (CABN 216799)
   Assistant United States Attorney
5
       1301 Clay Street, Suite 340-S
6      Oakland, California 94612
       Telephone: (510) 637-3680
7      Facsimile: (510) 637-3724
       E-Mail:    wade.rhyne@usdoj.gov
8
9  Attorneys for Plaintiff

10                UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                    OAKLAND DIVISION

13  UNITED STATES OF AMERICA,          )    No. CR-07-0659 DLJ
                                       )
14          Plaintiff,                 )
                                       )
15      v.                             )    UNITED STATES' MEMORANDUM OF
                                       )    POINTS AND AUTHORITIES IN
16  ERNEST PASCUAL BACA,               )    OPPOSITION TO DEFENDANT ERNEST
                                       )    PASCUAL BACA'S MOTION TO
17          Defendant.                 )    SUPPRESS
                                       )
18  _____ )

19

20                     **INTRODUCTION**

21          This Court should deny Defendant's motion in its entirety because the officers did not

22  violate Defendant's Fourth or Fifth Amendment rights during the encounter. The encounter did

23  not violate Defendant's Fourth Amendment rights because: (1) the events occurring before

24  Defendant's formal arrest did constitute an actual detention, and therefore did not even implicate

25  the Fourth Amendment; (2) even assuming the events occurring before Defendant's formal arrest

26  constituted an actual detention, the detention was lawful because it was properly supported by

27  reasonable suspicion; and (3) the ensuing search of Defendant's car was constitutional on

28  multiple grounds—as a parole search and an inventory search. Additionally, the encounter did

UNITED STATES' OPP. TO DEF.'S MOT. TO SUPPRESS
CR-07-0659 DLJ

1   not violate Defendant's Fifth Amendment rights under *Miranda* because the officers did not

2   subject Defendant to a "custodial interrogation." Accordingly, the officers did not violate

3   Defendant's constitutional rights and this Court should deny Defendant's motion in its entirety.

4                                   **FACTUAL BACKGROUND**

5           On August 2, 2007, Officer Armando Magana ("Office Magana") of the Fremont Police

6   Department ("FPD") was on patrol in his marked patrol car. (Magana Decl., ¶ 2, Ex. A, FPD

7   Investigation Report, at p. BACA-0014.) At approximately 1:32 a.m., Officer Magana observed

8   Defendant driving a green Toyota Corolla near the intersection of Mowry and Glenview Drive.

9   (*Id.*) Defendant, who was the sole occupant of the car, came to an extended stop at a stop sign

10  even though there were no other cars traveling in either direction. (*Id.* at ¶ 2, Ex. A at BACA-

11  0014.) Officer Magana ran Defendant's license plate and the car came back registered to the

12  Sisters of the Holy Family convent. (*Id.* at BACA-0014, 0015.) Immediately after Defendant

13  drove by Officer Magana, Defendant proceeded to park the car approximately 50 yards north of

14  the Mowry/Glenview intersection. (*Id.*) Officer Magana watched Defendant get out his car and

15  begin to walk down the sidewalk. (*Id.*) Based on his training and experience, Officer Magana

16  believed that Defendant surveilled Officer Magana's direction of travel and then made an

17  immediate and deliberate attempt to avoid police contact by parking the car and walking away.

18  (*Id.*; *See also* ¶ 3.)

19          Officer Magana recognized Defendant from "previous contact," but could not remember

20  Defendant's name. (*Id.* at ¶ 2, Ex. A at BACA-0014.) More specifically, Officer Magana

21  believed he recognized Defendant as being someone who had a criminal record, and who had

22  been either the subject of a previous arrest, and/or was on probation or parole. (*Id.* at ¶ 4.)[2]

23          From the middle of the roadway, Officer Magana initiated a consensual encounter with

24  Defendant. (*Id.*) While seated behind the wheel of his patrol car, Officer Magana initiated a

25  conversation with Defendant through the passenger-side window of the patrol car. (*Id.* at  Ex. A,

26  at BACA-0014.) Officer Magana did not shine his patrol lights or spotlight during the encounter.

27

28          [2]Defendant's criminal history record indicates that between January 1997 and August 2007, FPD has
    arrested Defendant on at least 6 occasions.

UNITED STATES' OPP. TO DEF.'S MOT. TO SUPPRESS
CR-07-0659 DLJ                              2

1   (*Id.*) Officer Magana asked whether Defendant was related to Greg Lopez, and Defendant

2   replied that he was not. (*Id.*) Officer Magana then asked Defendant some standard

3   questions—none of which Defendant answered truthfully. First, the officer asked for

4   Defendant's name; and Defendant replied that his name was "Chris Baca." (*Id.*) Second, the

5   officer asked whether Defendant had a valid driver's license and whether Defendant was on

6   probation; and Defendant stated that he had a valid license and that he was not on probation.

7   (*Id.*) Defendant told the officer that he was visiting his girlfriend, Ana Cueva ("Cueva"), who

8   lived at the corner of Mowry and Glenview. (*Id.*) In response, the officer told Defendant to have

9   a safe night and the officer began to drive away. (*Id.*)

10       Immediately after driving away, Officer Magana recalled Defendant's true name as Ernie

11   Baca—an Irvington Norteño Gang member who was then on parole. (*Id.; See also* ¶ 5.)[3] Upon

12   realizing that Defendant was a paroled gang member who had just given a false name, Officer

13   Magana immediately turned his patrol car around and re-approached Defendant near the corner

14   of Mowry and Glenview. (*Id.*) Officer Magana got out of his patrol car and approached

15   Defendant on foot. (*Id.* at Ex. A, BACA-0014.) In speaking with Defendant, Officer Magana

16   did not impede Defendant's direction of travel or order him to stop. (*Id.* at ¶ 7.) During their

17   conversation, the two men were standing approximately three car lengths from the location of

18   Defendant's parked car. (*Id.*) Officer Magana confronted Defendant for providing a false name

19   and for lying about his parole status, and Defendant continued to insist that his true name was

20   "Chris Baca." (*Id.* at Ex. A, BACA-0014; *See also* ¶ 7.) The officer told Defendant that he

21   recognized Defendant as "Ernie Baca" and that he knew Defendant was on parole. (*Id.; See also*

22   ¶ 7.) Defendant again untruthfully stated that he was not "Ernie Baca." (*Id.* at Ex. A, BACA-

23   0014.) Officer Magana told Defendant that he did not appreciate dishonesty, and again asked for

24   Defendant's name. (*Id.*) Defendant then admitted that his true name was Ernie Baca, that he was

25   on parole, and that he had lied to Officer Magana because Defendant did not want to "make a

27   [3]Based on Officer Magana's training and experience on street gangs, like the Irvington Norteños, it was his opinion that it was common for gang members to be in possession of dangerous weapons, firearms, and/or narcotics.

28   (Id. at ¶ 6.) It is also his experience that gangs commonly engage in street violence, and that most gang-related street violence occurs at night. (*Id.*)

scene" in front of his "girlfriend's house." (*Id.*) Officer Magana requested back up over his police radio, and Officer Travis MacDonald ("MacDonald") arrived to assist. (*Id.*)

At approximately 1:42 a.m., Officer Magana ran a record check on Ernest Baca and confirmed that Defendant was on active parole for robbery in violation of California Penal Code § 212.5, and was driving on a suspended/revoked license. (*Id.*; *See also* Def.'s Mot., Ex. B, at BACA-0180.) He also observed that Defendant had a tattoo of a "Huelga" bird on his life elbow which—based on Officer Magana's training and experience—is a common tattoo among Norteño gang members. (*Id.* at ¶ 1, Ex. A at BACA-0014.)

In conducting a parole pat-down search of Defendant, Officer Magana noted that Defendant was not in possession of any car keys despite the fact that he had just gotten out of his car. (*Id.*) Defendant told Officer Magana that:

- He had been out to dinner at Denny's with his girlfriend, Ana Cueva. (*Id.*)
- He and his girlfriend had driven his girlfriend's car to Denny's. (*Id.*)
- He had returned to his girlfriend's neighborhood because he left his cell phone in her car. (*Id.*)

Officer Magana then asked Defendant what he had done with the keys to the green Toyota Corolla. (*Id.*) In attempting to explain the location of his car keys, Defendant then told Officer Magana that he did not have his car keys in his possession because he had given them to his girlfriend, "Ana." (*Id.*)

In response to Defendant's statement about the keys, Officer Magana inquired why Defendant would have given his car keys to his girlfriend if he had returned only to recover his cell phone. (*Id.* at ¶ 1, Ex. A at BACA-0014.) After hesitating at the officer's question, Defendant then told the officer that:

- The car he was driving actually belonged to his mother. (*Id.* at BACA-0015.)
- His girlfriend's family was interested in buying his mother's car. (*Id.*)
- He had actually planned on leaving the car with his girlfriend. (*Id.*)

In an attempt to confirm Defendant's apparently conflicting statements, Officer Magana knocked on Cueva's front door, while Officer MacDonald stood next to Defendant. (*Id.*)

UNITED STATES' OPP. TO DEF.'S MOT. TO SUPPRESS
CR-07-0659 DLJ                                                4

1       At approximately 1:58 a.m., Officer Magana spoke to a female identifying herself as
2   Cueva at the front door the residence. (*Id., See also* Def.'s Mot., Ex. B, at BACA-0180.) Cueva
3   told Officer Magana that:

4       •   Defendant's real name was "Ernie Baca." (*Id.*)

5       •   Defendant had not given his car keys to her. (*Id.*)

6       •   She did not know the location of Defendant's car keys. (*Id.*)

7       •   Defendant had arrived at approximately midnight and they went to Denny's in her
8            car to eat. (*Id.*)

9       •   After eating, they returned to her house and Defendant left—which was
10           approximately an hour ago. (*Id.*)

11      •   She did not know why Defendant was in front of her house. (*Id.*)

12  Officer Magana again asked Defendant—this time in Cueva's presence—where he had placed
13  the car keys. (*Id.*) Defendant—while looking at Cueva—again replied that he had given them to
14  "his girlfriend," Cueva. (*Id.*) Cueva again stated that she did not have Defendant's car keys and
15  she did not know why Defendant was saying that she had the car keys. (*Id.*) At that point,
16  Officer Magana made contact with the registered owners of the car to ensure that the car had not
17  been stolen. (*Id.*) At that point, Officer Magana had no further questions for Cueva, and she
18  returned home. (*Id.*) Officer Managa placed Defendant under arrest for making a false
19  representation to a peace officer and for driving on a suspended license, in violation of California
20  Penal Code § 148.9 and California Vehicle Code § 14601, respectively. (*Id.*) Officer Magana
21  then handcuffed Defendant and placed Defendant in the backseat of the patrol car. (*Id.* at ¶ 8.)

22      At approximately 2:42 a.m., Officer Magana requested a tow truck to haul Defendant's
23  locked car. (Def.'s Mot., Ex. B, at BACA-0180.) While waiting for the tow truck to arrive,
24  Officer Magana conducted a plain view search of the passenger compartment with his flashlight.
25  (Magana Decl. ¶ 1, Ex. B, at BACA-0015.) During the plain view search of the car, Officer
26  Magana saw Defendant's car keys on the driver-side floor board and the apparent handle of a
27  handgun under the passenger-side seat. (*Id.*)

28

1    At approximately 2:59 a.m., the tow truck arrived on scene. (Def.'s Mot., Ex. B, at
2    BACA-0180.) Shortly thereafter, at approximately 3:07 a.m., Officer Jason Lambert ("Lambert")
3    arrived with his K-9 unit. (Lambert Decl. at ¶ 2, Ex. A at BACA-0023. ) After arriving, Officer
4    Lambert also observed the handle of a handgun under the passenger-side seat. (Lambert Decl. at
5    ¶ 3.) The tow truck driver then used a "Slim-Jim" to open the driver-side rear door of
6    Defendant's car. (Magana Decl. ¶ 9, Ex. A at BACA-0015; Lambert Decl. ¶ 3.) Upon entering
7    the car, Officer Magana found a loaded black 9 millimeter semi-automatic pistol partially hidden
8    under the passenger-side seat. (Magana Decl. ¶ 2, Ex. A at BACA-0015; Lambert Decl. ¶ 3.)
9    Officer Magana handed the pistol to Officer Lambert, who rendered the pistol "safe" and Officer
10   Magana opened the glove compartment and located the car's pink slip and DMV transfer form,
11   both in Defendant's name. (Magana Decl. ¶ 2, Ex. A at BACA-0015; Lambert Decl. ¶ 3.)
12   Before releasing the K-9 into Defendant's car, Officer Lambert examined the inside of the car for
13   any dangerous objects or substances that might harm his dog. (Lambert Decl. ¶ 4.) Officer
14   Lambert then released his K-9 into the passenger compartment of the car to search for additional
15   contraband. (*Id.*) The K-9 indicated the presence of narcotics by scratching on the center
16   console near the dashboard. (*Id.*) There, Officer Magana found an unlabeled medicine bottle
17   containing approximately three grams of methamphetamine. (Magana Decl. ¶ 2, Ex. A at
18   BACA-0015.) On the driver-side rear floorboard, Officer Magana found a portable hand-held
19   police scanner with earplugs. (*Id.* at BACA-0015-BACA-0016) In the trunk of the car, he found
20   three long gun boxes, each containing two long firearms—three shotguns and three high caliber
21   rifles. (*Id.* at BACA-0016.)

22       In accordance with the California Vehicle Code[4], after completing the search of
23   Defendant's car, the officers allowed the towing company to take custody of Defendant's car for
24   purposes of impoundment. (*Id.*)

25

26       [4]In relevant part, Section 14602.6 provides that, "[w]henever a peace officer determines that a person was
     driving a vehicle while his or her driving privilege was suspended or revoked . . . the peace officer may [ ]
27   immediately arrest that person and cause the removal and seizure of that vehicle . . . ." Cal. Veh. Code § 14601.6.
     Additionally, Section 22651(h)(1) provides that, the police may impound a vehicle "[w]hen an officer arrests any
28   person driving or in control of a vehicle for an alleged offense" and takes that person into custody. Cal. Veh. Code §
     22651(h)(1).

UNITED STATES' OPP. TO DEF.'S MOT. TO SUPPRESS
CR-07-0659 DLJ                                    6

1

**ARGUMENT**

2 **I.    Defendant Was Not Actually Detained Until the Officer Formally Arrested Him.**

3        The events occurring before Defendant's formal arrest did constitute an actual detention,

4 and therefore did not implicate the Fourth Amendment. Specifically, Officer Magana engaged in

5 two consensual encounters with Defendant, neither of which implicated the Fourth Amendment.

6 During the first encounter, Officer Magana spoke to Defendant through the passenger-side

7 window of his patrol car from the middle of the roadway. During the second encounter, Officer

8 Magana re-approached Defendant and asked him why Defendant had given a false name during

9 the initial encounter. Because neither encounter involved physical force or a show of authority,

10 and because Officer Magana's actions would not have caused a reasonable innocent person to

11 feel compelled to submit, there was no actual Fourth Amendment seizure until the police

12 formally arrested Defendant.

13        An individual is "seized within the meaning of the Fourth Amendment only if, in view of

14 all the circumstances surrounding the incident, a reasonable person would have believed that he

15 was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).[5] "Only when

16 the officer, *by means of physical force or show of authority*, has in some way restrained the

17 liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19

18 n.16 (1968) (emphasis added). Courts must "consider all the circumstances surrounding the

19 encounter to determine whether the police conduct would have communicated to a reasonable

20 person that the person was not free to decline the officers' requests or otherwise terminate the

21 encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991).

22        A police officer may approach an individual on the street and ask questions, including

23 requesting identification, without violating or even implicating the Fourth Amendment. *See*

24 *Bostick*, 501 U.S. 429, 434 (1991) ("[M]ere police questioning does not constitute a seizure.");

25 *United States v. Erwin*, 803 F.2d 1505, 1508 (9th Cir. 1986) (quoting *Florida v. Royer*, 460 U.S.

26

27
    [5]Defendant incorrectly assumes that Officer Magana's subjective legal conclusions are relevant in

28 determining whether an individual is seized within the meaning of the Fourth Amendment. (Def.'s Mot. at 6:13-26; 8:20-23.)

UNITED STATES' OPP. TO DEF.'S MOT. TO SUPPRESS
CR-07-0659 DLJ                                   7

1  491, 497 (1983) (stating law enforcement officers do not violate the Fourth Amendment by

2  merely approaching an individual on the street by asking questions.). The Ninth Circuit has

3  likewise held that "[a] law enforcement officer may stop and question any person, for any reason,

4  as long as that person 'remains free to disregard the questions and walk away.'" *United States v.*

5  *Malone*, 886 F.2d 1162, 1164 (9th Cir. 1989) (citations omitted); *see also INS v. Delgado*, 466

6  U.S. 210, 216 (1984) (holding that INS inspectors could, without reasonable suspicion, enter a

7  workplace, ask to examine a person's identification, and ask questions); *United States v.*

8  *Christian*, 356 F.3d 1103, 1106 (9th Cir. 2004) (holding that "interrogation relating to one's

9  identity or a request for identification by the police does not, by itself, constitute a Fourth

10 Amendment seizure"); *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994) (finding that

11 officers do not implicate the Fourth Amendment by such inquiries.)

12         The factual record in this case demonstrates that Defendant was not detained until the

13 officers formally arrested him. During the initial encounter, Officer Magana merely asked a

14 series of questions pertaining to Defendant's identity, Defendant's probationary status, and

15 whether Defendant possessed a valid driver's license. During the subsequent encounter, Officer

16 Magana followed up because he believed Defendant had lied. At no time did Officer Magana

17 physically restrain Defendant or inform him that he was not free to leave. Rather than walk away

18 from the initial encounter, Defendant voluntarily answered Officer Magana's questions and even

19 referred the officers to his girlfriend, Cueva. During Defendant's conversation with Cueva,

20 Officer Magana actually left the area and told Defendant and Cueva to discuss what had

21 happened to the car keys. The only reason the encounter continued was because Defendant made

22 numerous false representations, thereby prompting Officer Magana to ask additional questions

23 and seek additional clarification. The officers made efficient efforts to verify the veracity of what

24 Defendant had told them. At no time did any of the officers raise their voice, block Defendant's

25 path, or otherwise display behavior that would cause a reasonable innocent person to believe they

26 could not have avoided the encounter. Rather it was not until the officers formally arrested

27 Defendant—by handcuffing him, placing him into the police car, calling the tow truck—when

28 the officers actually exhibited the amount physical restraint authority that would cause a

1    reasonable innocent person to believe they could not terminate the encounter. Because the

2    officer's actions did not implicate the Fourth Amendment, the Court should deny Defendant's

3    motion to suppress the detention.

4    **II.    Even if the Court Finds That Defendant was Detained During the Second
         Encounter, There was Reasonable Suspicion to Support the Detention.**

5

6         Defendant's initial act of lying to the officer about his true identity and his parole status

7    during the consensual encounter gave the officer *reasonable suspicion* to elect to make an

8    investigatory detention once the officer realized Defendant was a paroled gang member who had

9    just given a false name. Defendant's subsequent act of lying a second time about his name

10   during the resulting investigatory detention gave the officer *probable cause* to arrest for multiple

11   statutory violations. Accordingly, because Officer Magana had (i) reasonable suspicion to make

12   the investigatory detention, and then (ii) probable cause to make the ensuing formal arrest, there

13   was no Fourth Amendment violation in this record.

14        The Fourth Amendment protects individuals from "unreasonable searches and seizures."

15   U.S. Const. Amend. IV. According to the Supreme Court, there are three types of police-citizen

16   encounters: (1) consensual encounters which do not implicate the Fourth Amendment, *see, e.g.,*

17   *Michigan v. Chesternut,* 486 U.S. 567, 574-76 (1988); *INS v. Delgado,* 466 U.S. 210, 218-21

18   (1984); (2) investigative detentions which are Fourth Amendment seizures of limited scope and

19   duration and must be supported by a reasonable suspicion of criminal activity, *see, e.g., United*

20   *States v. Sokolow,* 490 U.S. 1, 7 (1989); *Terry v. Ohio,* 392 U.S. 1, 30 (1968); and (3) arrests, the

21   most intrusive of Fourth Amendment seizures and reasonable only if supported by probable

22   cause. *See, e.g.. Hayes v. Florida,* 470 U.S. 811, 815-16 (1985); *Dunaway v. New York,* 442

23   U.S. 200, 212-16 (1979). At issue here is the second type of encounter—the investigatory

24   detention—whether Officer Magana had reasonable suspicion that "criminal activity may be

25   afoot." *Terry,* 392 U.S. at 30.

26        Reasonable suspicion requires the officer to have knowledge of specific, articulable facts

27   which together with "objective and reasonable" inferences, form a basis for suspecting that a

28   particular person is engaged or about to be engaged in criminal conduct. *See United States. v.*

1   *Magana*, 2007 WL 2384778 at *2 (E.D. Cal. 2007) (J. Jensen) (citing *Terry*, 392 U.S. at 20;

2   *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989)). No rigid test or

3   neat legal rule is used to assess when this standard is met. *Terry*, 392 U.S. at 8. While a law

4   enforcement officer's "inchoate hunch" or "unparticularized suspicion" is insufficient, the

5   standard is "considerably less than proof of wrongdoing by a preponderance of the evidence" . . .

6   and "obviously less demanding than that for probable cause." *Terry*, 392 U.S. at 8; *Sokolow*, 490

7   U.S. at 8. The approach is intended to be flexible and provide law enforcement officers with a

8   tool to investigate suspicious activity. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985).

9   Therefore, in assessing whether law enforcement had reasonable suspicion to conduct a stop, a

10  court looks at the totality of the circumstances. *Sokolow*, 490 U.S. at 7-8. In doing so, the U.S.

11  Supreme Court has stated that courts must evaluate the factual circumstances in light of the

12  training and experience of the officer because some patterns of behavior which may seem

13  innocuous to the untrained eye may not appear so innocent to the eye of the trained police officer.

14  *See e.g. United States v. Cortez*, 449 U.S. 411, 418 (1981).

15          In the current case, the record contains sufficient facts for the Court to find that Officer

16  Magana had developed reasonable suspicion before initiating the investigatory detention. As

17  explained below, Officer Magana properly used his training and experience to reasonably rely on

18  his own visual observations, Defendant's suspicious conduct, Defendant's false statements, and

19  the totality of the surrounding circumstances.

20          Before initiating the investigatory detention, Officer Magana made a number of visual

21  observations. In particular, he observed that Defendant remained stopped at a stop sign for a

22  long period of time even though there was no traffic in either direction of the intersection. He

23  also observed that the car was registered to a convent of Nuns. As Officer Magana arrived at the

24  intersection, Defendant turned right, immediately pulled to the side of the road, parked the car,

25  got out of the car, and began to walk away from the area. While this series of facts may be

26  innocuous to a lay person, they were significant to Officer Magana because it appeared that

27  immediately after spotting the police car, Defendant surveilled Officer Magana's direction of

28  travel and then made an immediate and deliberate attempt to avoid police contact and to distance

UNITED STATES' OPP. TO DEF.'S MOT. TO SUPPRESS
CR-07-0659 DLJ                              10

1   himself from the Toyota Corolla. Based on his training and experience, Officer Magana believed

2   that Defendant's actions were indicative of someone who was engaging in some form of criminal

3   activity. Admittedly, although the simple acts of parking a car in a high crime neighborhood and

4   walking away from a police officer would not create reasonable suspicion alone, *Moreno v. Baca*,

5   431 F.3d 633, 643 (9th Cir. 2005), Defendant's collective actions remain relevant in assessing

6   Officer Magana's conduct under the totality of the circumstances. *See e.g., Illinois v. Wardlaw*,

7   528 U.S. 119, 124 (2000).

8        Also before initiating the investigatory detention, Officer Magana developed a number of

9   suspicious facts during his initial encounter with Defendant. During that encounter, Defendant

10  made a series of false representations. Upon realizing that Defendant's representations were

11  false, Officer Magana buttressed his initial suspicion that Defendant may be engaging in criminal

12  conduct. Most importantly was Defendant's false representation about his name and parole

13  status. Because Officer Magana reasonably concluded that Defendant was attempting to conceal

14  his identity, and because Officer Magana new that Defendant was actually a paroled Irvington

15  Norteño Gang member, it was reasonable for Officer Magana to conduct further investigation.

16  Again, while these facts alone would not amount to reasonable suspicion, when taken together, it

17  was reasonable for Officer Magana to conclude that criminal activity may be afoot.

18       Finally, before initiating the investigatory detention, Officer Magana relied on his training

19  and experience with gangs. Based on that experience, it was reasonable for him to conclude that

20  Defendant intended to conceal some form of criminal activity sometimes common among gang

21  members—such as narcotics, weapons, and/or street violence. Because Officer Magana had

22  knowledge of specific articulable suspicious facts, and because his reasonable inferences caused

23  him to suspect that criminal activity was afoot, he had reasonable suspicion to conduct the

24  investigatory detention.

25       Defendant's motion incorrectly conflates the legal standards for reasonable suspicion and

26  probable cause. According to Defendant, the investigatory detention lacked reasonable suspicion

27  for one reason—because Officer Magana failed to "refer to any California statute making it

28  illegal to provide a false name to a peace officer . . . ." (Def.'s Mot. to Supp. at 6:7-9.) If

UNITED STATES' OPP. TO DEF.'S MOT. TO SUPPRESS
CR-07-0659 DLJ                              11

Defendant is correct, and a finding of reasonable suspicion is dependent upon an officer's subjective belief that a person had violated a particular criminal statute or committed a specific offense, then there would be little difference between the legal standards for reasonable suspicion and probable cause.

Probable cause focuses more the commission of a particular offense, and it exists when "facts and circumstances within the officer's knowledge [ ] are sufficient to warrant a prudent person [ ] in believing [ ] that the suspect has committed, is committing , or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Henry v. United States*, 361 U.S. 98, 102 (1959). In contrast, reasonable suspicion is less demanding and focuses more on suspicious activity—rather than an actual offense—and it exists when knowledge of specific and articulable facts form a basis to conclude that "criminal activity may be afoot." *Terry*, 392 U.S. at 30. Accordingly, Officer Magana did not need to rely on a particular statutory violation or on a belief that Defendant was about to commit a particular criminal offense. Instead, Officer Magana only needed knowledge of specific articulable facts, along with reasonable inferences, to suspect that criminal activity was afoot. Because Officer Magana observed Defendant engage in a series of suspicious acts, and because Officer Magana made reasonable inferences based on those acts, he acted properly concluded that Defendant was engaged in criminal activity. Accordingly, there was reasonable suspicion to support the investigative detention and Defendant's motion to suppress the detention fails.

## III. The Search of Defendant's Car was Constitutional on Multiple Grounds.

The search of Defendant's car was constitutionally permissible as a parole search, as an inventory search, and under the inevitable discovery doctrine.

### A. The Search of Defendant's Car was a Permissible Parole Search.

Courts have recognized that probationers and parolees have a reduced expectation of privacy by virtue of search conditions imposed on them as a result of their probation or parole status, and that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Samson v. California*, 547 U.S. 843 (2006).

1    Under California law, inmates who are eligible for release on state parole "shall agree in

2 writing to be subject to search or seizure by a parole officer or other peace officer at any time of

3 the day or night, with or without a search warrant and with or without cause." Cal. Pen. Code §

4 3067(a). However, such a search condition requires the police to have advance knowledge that

5 the search condition applied before they conducted the search. *See, e.g., Samson v. California,*

6 547 U.S. 843, 856 n. 5 (2006) (noting that "[u]nder California precedent . . . an officer would not

7 act reasonably in conducting a suspicionless search absent knowledge that the person stopped for

8 the search is a parolee."); *Fitzgerald v. City of Los Angeles,* 485 F. Supp. 2d 1137, 1142 (C.D.

9 Cal. 2007) (noting that "advance knowledge of a parolee's status is critical to the

10 constitutionality of a suspicionless search of a parolee").

11    In this case, there is a sufficient factual basis for the Court to find that the search of

12 Defendant's car was a permissible parole search. By the time he actually searched Defendant's

13 car, Officer Magana had confirmed: (1) that Defendant was then on active parole; (2) that the

14 terms of Defendant's parole included a search condition; (3) that Defendant was a parolee of the

15 State of California; and (4) that the prior offense resulting in Defendant's parole was robbery, in

16 violation of California Penal Code 212(c). Against that factual backdrop, Officer Magana had

17 also independently developed reasonable suspicion that the car contained contraband.

18 Specifically, Officer Magana had already conducted a plain view search of the passenger

19 compartment and observed the handle of the handgun underneath the passenger seat of

20 Defendant's car. Accordingly, prior to initiating the search of Defendant's car, Officer Magana

21 had obtained advanced knowledge of Defendant's search condition and had developed

22 reasonable suspicion of criminal activity. For those reasons, the search of Defendant's car was a

23 permissible parole search and the Court should deny Defendant's motion to suppress.

24    **B.    The Search of Defendant's Car was a Permissible Inventory Search.**

25    California Vehicle Code § 14602.6 provides that, "[w]henever a peace officer determines

26 that a person was driving a vehicle while his or her driving privilege was suspended or revoked .

27 . . the peace officer may [ ] immediately arrest that person and cause the removal and seizure of

28

1  that vehicle . . . ." Cal. Veh. Code § 14601.6. "A vehicle so impounded shall be impounded for

2  30 days." *Id.*

3      A lawfully impounded vehicle may be inventory searched for the purpose of determining

4  its condition and contents. *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976). Anything

5  observed in the vehicle during the inventory search is admissible against the defendant. *Id.*

6  Inventory searches of lawfully impounded vehicles serve three distinct needs: (1) the protection

7  of the owner's property while it remains in police custody; (2) the protection of police against

8  claims or disputes over lost or stolen property; and (3) the protection and safety of the police

9  from potential danger. *Id.* at 369 (citations omitted); *see also United States v. Penn*, 233 F.3d

10  1111 (9th Cir. 2000) (upholding the warrantless search of an automobile and contents as a valid

11  inventory search).

12      In this case, at the time the officers actually searched Defendant's car, they had probable

13  cause to arrest Defendant for driving on a suspended license and for making a false

14  representation to a peace officer during a lawful detention[6], in violation of California Vehicle

15  Code § 14601 and California Penal Code § 148.9, respectively. Because Defendant was driving

16  with a suspended license, the officers had a lawful basis to remove, seize, and impound the car

17  for 30 days. Cal. Veh. Code § 14601.6. Pursuant to that impoundment and because the car was

18  in lawful police custody, the officers had a proper basis to conduct an inventory search of the car.

19  It would be unreasonable for the officers to leave Defendant's car on the street in the middle of

20  the night when they knew it contained a visible firearm. It would have been equally

21  unreasonable for the officers to allow the towing company to take custody of Defendant's car

22  under those circumstances. Because the officers had a lawful basis to impound Defendant's car,

23  they necessarily had a lawful basis and obvious responsibility to conduct an inventory search.

24  Because anything observed inside a vehicle during an inventory search is admissible, Court

25  should deny Defendant's motion to suppress the evidence found in Defendant's car.

26

27

28  [6]In his motion, Defendant concedes that "[he] was detained once the officer approached him for a second
time and questioned him repeatedly and insistently about his true identity"—which would be a violation of California
Penal Code § 148.9. (Def.'s Mot. at 6:5-6.)

1
2

**C.    The Officers Would Have Inevitably Discovered Defendant's
Methamphetamine and Firearms Once Defendant's Car Was Actually
Impounded**

3    Even if the Court were to find that the search of Defendant's car was not constitutionally

4    permissible as a parole search or as an inventory search, then the evidence would still be

5    admissible under the inevitable discovery doctrine. Officers would have inevitably discovered

6    the methamphetamine and firearms during the routine inventory search conducted prior to

7    actually impounding the car.

8    Information, even if unlawfully obtained, will still be admissible if it would have

9    inevitably been discovered through other lawful means. *Nix v. Williams*, 467 U.S. 431, 444, 447

10   (1984). The Ninth Circuit has previously held that information that would have inevitably been

11   discovered in the course of a routine inventory search should not be suppressed and can be

12   properly admitted under the inevitable discovery doctrine. *United States v. Mancera-Londono*,

13   912 F.2d 373, 375 (9th Cir. 1990) (notwithstanding warrantless search of a car, the evidence

14   would have inevitably been dsicovered upon impoundment and inventorying of the car); *United*

15   *States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986) (evidence discovered from the

16   defendant's garment bag, which was searched an hour after arrest, would have been discovered

17   during the course of a routine inventory search and was therefore admissible).

18   Here, before the officers ever searched Defendant's car, they had lawfully arrested

19   Defendant and called the tow truck. For that reason, the towing of Defendant's car was

20   inevitable. Accordingly, because the police would have routinely searched Defendant's car prior

21   to putting it into the impound lot, they would have inevitably found Defendant's

22   methamphetamine and the firearms. For this additional reason, the Court should deny

23   Defendant's motion to suppress.

24   **IV.   The Officers Did Not Obtain Defendant's Statements in Violation of the Fifth
Amendment.**
25

26   In *Miranda v. Arizona*, the Supreme Court adopted prophylactic procedural measures to

27   guarantee that a suspect is advised of his Fifth Amendment rights before custodial interrogations.

28   *Miranda v. Arizona*, 384 U.S. 436 (1966). Once law enforcement officers take suspects into

1   custody, the officers may not interrogate the suspects without first exercising certain procedural
2   safeguards, including informing the suspects of their rights to remain silent and to have an
3   attorney present. *Id.* at 444. In this case, Officers did not obtain Defendant's statements in
4   violation of the Fifth Amendment because Defendant was never subjected to custodial
5   interrogation.

6   **A.   Defendant was Not in "Custody" for Purposes of *Miranda* Until He was
        Formally Arrested.**

8       In the current case, where a suspect has not formally been taken into police custody, the
9   suspect is nevertheless considered "in custody" for purposes of *Miranda* if the suspect has been
10  "deprived of his freedom of action in any significant way." *Id.* at 444. To determine whether the
11  suspect was in custody, courts must first examine the totality of the circumstances surrounding
12  the interrogation. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Next, courts must
13  examine whether a reasonable person in those circumstances would "have felt he or she was not
14  at liberty to terminate the interrogation and leave." *Id.*; *see also Berkemer v. McCarty*, 468 U.S.
15  420, 442 & n. 35 (1984). When making that evaluation, courts consider the totality of the
16  circumstances that confronted a defendant at the time of questioning in light of such factors as:
17  (1) the language used to summon Defendant, (2) the extent to which Defendant was confronted
18  with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the
19  detention, and (5) the degree of pressure applied to detain Defendant. *United States v. Crisco*,
20  725 F.2d 1228, 1231 (9th Cir.), cert. denied, 466 U.S. 977 (1984).

21      Defendant was not in "custody" for purposes of *Miranda* until he was placed under
22  formal arrest. In this case, the officers did not forcibly summon Defendant to answer any
23  questions. Officer Magana never raised his voice and never told him he was not free to leave.
24  Additionally, the physical surroundings of the encounter were non-coercive, because the events
25  occurred in public view on the sidewalk in downtown Fremont. The duration of the encounter
26  from the initial encounter to formal arrest was brief. The initial encounter began no earlier than
27  1:32 a.m., which was when Officer Magana first spoke to Defendant; and the formal arrest of
28  Defendant was no later than 2:42 a.m., which was when Officer Magana called the tow truck.

1    (See Def.'s Mot. at Ex. B, BACA-0180.) Accordingly, the discussions between Officer Magana
2    and Defendant lasted a little over one hour, at the most. Any delay in the process was not due to
3    the officers, but instead a result of the officer's attempt to untangle Defendant's series of lies.
4    The officers also did not unduly pressure Defendant during the encounter. The officers never
5    deprived Defendant of his freedom in any significant way prior to arresting him—they never
6    physically restrained him, they never told him that he could not leave, and they never took him
7    from the scene to a police station. Because the entire encounter was brief, and because the
8    officers never deprived Defendant of his freedom, Defendant was not in custody for purposes of
9    *Miranda*. For those reasons, the Court should deny Defendant's motion to suppress his
10   statements.

11   **B.    The Officers Did Not "Interrogate" Defendant for Purposes of *Miranda*.**

12       The officers did not interrogate Defendant for purposes of *Miranda* because the questions
13   were not designed to elicit incriminating responses. Instead the questions were designed to elicit
14   routine biographical and booking-related information.

15       For police statements to be considered "interrogation," they "must reflect a measure of
16   compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S.
17   291, 300 (1980). The term "interrogation" means "any words or actions on the part of the police
18   (other than those normally attendant to arrest and custody) that the police should know are
19   reasonably likely to elicit an incriminating response." *Id.* at 301. The test is an objective one;
20   the subjective intent of the police is relevant, but not conclusive. *United States v. Booth*, 669 F.2d
21   1231, 1238 (9th Cir. 1981). The asking of routine gathering of background biographical
22   information, such as identity, age, and address, does not constitute interrogation. *See e.g., United*
23   *States v. Washington*, 462 F.3d 1124, 1131 (9th Cir. 2006) (citing *Booth*, 669 F.2d at 1238); *see*
24   *also United States v. Foster*, 227 F.3d 1096, 1102-03 (9th Cir. 2000); *Pennsylvania v. Muniz*,
25   496 U.S. 582 (1990) (plurality opinion) (establishing a "routine booking question" exception
26   under which questions regarding name, address, height, weight and other general information for
27   booking or pretrial services do not constitute interrogation).

28

UNITED STATES' OPP. TO DEF.'S MOT. TO SUPPRESS
CR-07-0659 DLJ                                    17

1   In speaking with Defendant, Officer Magana initially asked questions concerning

2   Defendant's identity and parole status.  Because Defendant's identity and parole status are

3   common biographical and booking-related questions, Officer Magana did not interrogate

4   Defendant for purposes of *Miranda* when he asked about them.  Accordingly, Defendant's

5   responses to these questions are fully admissible at trial against him.

**CONCLUSION**

7   This Court should deny Defendant's motion in its entirety because the officers did not violate

8   Defendant's Fourth or Fifth Amendment rights during the encounter.  The encounter did not

9   violate Defendant's Fourth Amendment rights because: (1) the events occurring before

10  Defendant's formal arrest did constitute an actual detention, and therefore did not even implicate

11  the Fourth Amendment; (2) even assuming the officers' pre-arrest actions constituted an actual

12  detention, their conduct was properly supported by reasonable suspicion; and (3) the ensuing

13  search of Defendant's car was constitutional on multiple grounds—as a parole search and as an

14  inventory search.  Additionally, the encounter did not violate Defendant's Fifth Amendment

15  rights under *Miranda* because the officers did not subject Defendant to a "custodial

16  interrogation."  Accordingly, the officers did not violate Defendant's constitutional rights and

17  this Court should deny Defendant's motion in its entirety.

19                          Respectfully submitted,

20                          JOSEPH P. RUSSONIELLO
                            United States Attorney

22  DATED: September 5, 2008

23                          WADE M. RHYNE
                            Assistant United States Attorney

# EXHIBIT A
# TO DECLARATION OF OFFICER ARMANDO MAGANA

## DECLARATION OF OFFICER ARMANDO MÁGANA

I, ARMANDO MAGANA, hereby declare and state as follows:

1.    I am an Officer with the Fremont Police Department, and have been a police officer with the City of Fremont since November 2002.  I submit this declaration in support of the United States' Opposition to Defendant Ernest Pascual Baca's motion to suppress.  Except where expressly stated otherwise, I have personal knowledge of the facts stated in this declaration, and if called as a witness, could and would competently testify thereto.

2.    Attached hereto as Exhibit A is a true and correct copy of a portion of the Fremont Police Department Report for incident number 070802004.  I authored the original portion of this report, labeled as BACA-0014 through BACA-0017.  The contents of the report are true and accurate to the best of my knowledge and belief.

3.    On August 2, 2007 at approximately 1:32 a.m., it was my belief, based on my training and experience, that immediately after seeing my police car, Defendant attempted to surveil my direction of travel by pausing at the intersection of Mowry and Glenview, and that he then made an immediate attempt to avoid police contact by parking the car and walking away from the Toyota Corolla.

4.    As I observed Defendant walking down the sidewalk, I believed I recognized him from previous contact as being someone who had a criminal record, and who had been either the subject of a previous arrest, and/or was on probation or parole.

5.    After driving away from Defendant, I recalled Defendant's true name as Ernie Baca—an Irvington Norteño Gang member.  I also recalled that Ernie Baca a name I believed to be on active parole.

6.    I have received training and experience on street gangs, like the Irvington Norteños.  Based upon my training and experience, it is my opinion that it is common for gang members to be in possession of dangerous weapons, firearms, and/or narcotics.  It is also my experience that gangs commonly engage in street violence, and that most gang-related street

1

violence occurs at night.

    7.      After getting out of my police car, I approached Defendant on foot. During the ensuring conversation, I did not impede Defendant's direction of travel or order him to stop. While we spoke, we were standing approximately three car lengths from the location of Defendant's parked car. During the conversation, I confronted Defendant for providing a false name and for lying about his parole status. I told Defendant that I recognized him as "Ernie Baca" and that I knew he was on parole.

    8.      Shortly after my initial conversation with Defendant's "girlfriend," Ana Cueva, I placed Defendant under formal arrest by handcuffing him and placing him in the backseat of my patrol car.

    9.      The tow truck driver used a "Slim-Jim" to open the driver-side rear door of Defendant's car. After entering the car, I removed the handgun and handed it to Officer Lambert so that he could render the weapon "safe."

    10.    When Fremont Police Department officers arrange for the towing of an arrestee's vehicle, the vehicle is towed to an impound lot. Before the car is impounded, officers conduct a routine inventory search that includes a search of the passenger compartment, the trunk, and any containers contained therein.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed this 5th day of September, 2008. in Fremont, California.

                                                            ARMANDO MAGANA

2

**070802004**    Supplement No  ORIG

## Fremont Police Department

### Property Summary

Involvement
EVD

Description
DRUG: 3 GM of Amphetamine/Methamphetamine plastic bottle w/pills/baggie
w/sus meth

Involvement    Description
SFK    ARTICLE: OTHER ITEMS OTHER    bail bonds key band with two house keys

### Summary Narrative

Please use this summary for charging.

On August 02, 2007 I was working uniformed patrol and driving marked patrol car #515. At approximately 0132 hours I was traveling w/b Mowry approaching Glenview when I noticed a vehicle (Green Toyota Corolla) stopped at the stop sign at w/b Mowry frontage and Glenview. The vehicle remained stopped at the stop sign (brake lights lit) for what appeared to be a long period of time. I did not observe any vehicles traveling in any direction.

I arrived at Glenview Dr and turned n/b. The vehicle made a right turn right in front of me and proceeded n/b on Glenview. I noticed as the vehicle passed that it was occupied by one male subject wearing glasses. I ran a license plate check (3VSD631) and the information returned clear and valid. The vehicle immediately pulled to the right hand side of the road way and parked (approximately 50 yards north of Mowry).

I slowed and observed a Hispanic male wearing glasses exit the driver door and walk to the sidewalk. I stopped in the middle of the roadway just behind the Corolla and rolled down my window. I recognized the male subject from previous contact but could not remember his name. I remained seated in my patrol vehicle (no lights or spotlights activated) and spoke to the male subject through my passenger window.

I asked the male subject if he was related to Greg Lopez. The male subject said he was not related to that person but was close friends with his family. I asked the subject what his name was and he said Chris Baca. I asked the subject if he had a valid driver's license and if he was on probation. The subject said he possessed a valid license and was not on probation. The male subject said he was visiting his girlfriend (Ana Cueva) who lived at the corner of Mowry/ Glenview. I did not recognize the first name the subject provided (Chris) but did not have any reason to detain the subject. I told the subject to be safe and I drove away.

I made a U-turn and drove back towards Mowry and turned w/b. I immediately recalled the name of the subject as Ernie Baca and realized he had lied to me. I recalled Ernie Baca to be an Irvington Norteno Gang member. I made a u-turn at Mowry/ Blacow and drove back to re-contact the subject. I contacted the subject at the n/e corner of or Mowry/ Glenview within several minutes from my first contact. I exited my patrol car and walked up to the subject (again no lights or sirens activated). I confronted the subject about his name. The subject again identified himself as Chris Baca. I told the subject that I recognized him as Ernie Baca. The subject hesitated and said he was not Ernie Baca. I told the subject that I didn't appreciate his dishonesty and asked him again what his name was. The subject then said he was Ernie Baca. I asked Baca why he lied to me and he said because he was on parole and did not want to make a scene in front of his girlfriend's house (violation of PC 148.9). I requested a cover unit and Officer Macdonald arrived to assist.

I ran a record check on Ernest Baca and confirmed he was active to parole for violation of PC 212.5 (c). His driver license information (B7533471) returned suspended/ revoked and his license was surrendered by subject (violation VC14601). I noticed his left elbow had a tattoo of a "Huelga" bird, common among the Norteno gang members.

Based on a condition of his parole, I conducted a thorough search of his person for illegal items/contraband which met with negative results. I noticed during the search that he was not in possession of car keys despite the fact that I had just seen him park the car.

Baca told me the following in summary. Initially Baca said he went out to dinner with Ana this evening at Denny's (Mowry/Farwell). Baca said they drove to Denny's and returned afterwards in her black car. Baca said he returned because he left his cell phone in Ana's car. I asked Baca where the keys to the Corolla were and he said he gave them to Ana. I asked Baca if he returned only to get his cell phone why would he give the keys to Ana. Baca hesitated before answering and appeared to be thinking of what to say next.

Report Officer
12199/MAGANA, ARMANDO

Printed At
08/07/2007 11:25

Page 2 of 10

**070802004**    Supplement No
ORIG

# Fremont Police Department
## Summary Narrative

Baca then said the green Toyota Corolla belonged to his mother and that Ana's family was interested in buying it. Baca said he brought the car over to the house and planned on leaving it with Ana Cueva (this completely contradicted his early statement about returning for his cell phone. Based on his behavior and change of stories I thought the car may have been stolen.

Officer Macdonald stood by with Baca while I contacted Ana at the front door. A male answered the door and said Ana was home but was sound asleep. I asked the family member to wake her up because I needed to speak with her. A female arrived at the front door and verbally identified herself as Ana Cueva. I ran a record check on Ana and learned she was active to probation for HS 11550 (docket 193260) with an S-7 search clause. I pointed to the male sitting on the curb in front of her house and asked her who the subject was. Ana replied "Ernie Baca". I asked her why he was in front of her house and she said she did not know. Ana said Ernie left approximately an hour ago and she went to sleep.

Ana said Ernie arrived at approximately midnight and they went to Denny's in her car to eat. After they ate she said they returned to her house and he left. I asked Ana if she had the key to the Corolla and she said "No". I asked her if Baca left his cell phone in her car and she said she did not know. Ana offered to walk out and check her car for Baca's cell phone. I walked with her to a black Pontiac Sun fire and she located his cell on the passenger side of her car. I asked Ana to give the phone to Baca herself and ask him why he said he gave her they key to the Corolla. Ana willing walked over to where Baca was being detained and handed him his phone.

Ana became hesitant and did not say anything to Baca. I asked Baca in front of Ana what he did with the key to the Corolla. Baca said he gave it to her and looked at Ana. Ana said she did not have the key to the Corolla and did not know why he was saying that. I reminded Ana that she was on searchable probation and that she should be honest about the location of the key. I told Ana to talk with Baca about the location of the key while I made contact with the registered owner of the Corolla to ascertain if the vehicle was an unreported stolen vehicle.

I made contact with Sister Ann Gelles from Sisters of the Holy Family convent and confirmed the vehicle was not stolen. Gelles advised that Baca's mother Arlene worked at the convent. I tried to reach Arlene Baca with negative results. I asked Ana and Baca if they came up with the location of the key and they said no. I had no further questions for Ana and she returned to her home.

I arrested Baca for PC 148.9 (False name to Officer) based on the fact that he initially told me he was Chris Baca. I also arrested him for VC 14601 since I had observed him driving the corolla, pulling over to the curb to park and exit the driver side of the car with clear and unobstructed view. I confirmed his identity was Ernest Baca. I confirmed he was a parole and had a suspended driver's license. I handcuffed Baca and secured him in my patrol car.

I requested a tow for the Corolla per VC 14602.6. The vehicle was locked and the windows were rolled up. Prior to the arrival of the tow company I shined my flashlight through the windows of the car. I noticed what appeared to be the keys to the car on the floor board of the driver side. I further noticed what appeared to be the handle of a handgun underneath passenger seat. Allways tow arrived and the driver was able to unlock the driver side rear door for me to gain access. Officer Lambert and his K-9 arrived to assist with the search.

I searched the car and located a loaded black 9mm hand gun tucked under the passenger seat. Officer Lambert rendered the gun safe. Officer Macdonald photographed the handgun with his digital camera and I secured the gun in the trunk of my patrol car. I located the pink slip to the car and a DMV transfer form in the glove box. The pink slip was signed off by registered owner and the DMV for was filled out and signed by Ernest Baca. I collected the indicia with Ernest Baca's information and later submitted them in as evidence.

K-9 "Dax" was deployed to search the car for contraband. Officer Lambert deployed canine "Dax" into the vehicle and he indicated the presence of odor of narcotics/drugs in the area of the center console at the front of the dash by scratching.

I located a white medicine bottle (no name listed on the label) in the center counsel. Inside the bottle I located a clear plastic baggie with a white crystal like substance. From my training and experience I recognized the substance to be methamphetamine. Officer MacDonald photographed the bottle and suspected methamphetamine and I secured the substance in the trunk of my patrol car. I later weighed and NIK tested the

| Report Officer | Printed At | |
|---|---|---|
| 12199/MAGANA, ARMANDO | 08/07/2007 11:25 | Page 3 of 10 |

**070802004**   Supplement No
ORIG

# Fremont Police Department
## Summary Narrative

substance at the station. The substance weighed approximately 3.0 grams in its packaging and was presumptive positive for methamphetamine.

I located a portable hand held scanner with earplugs in the driver side rear floorboard. I collected the scanner and later submitted the scanner in as evidence. In the trunk of the car I located three long gun boxes. In each box contained two long firearms (3 rifles and 3 shotguns). The firearms in the trunk were not loaded and no ammunition was located in the trunk. Officer MacDonald photographed the firearms and I secured them in the rear of my patrol car. Officer MacDonald later downloaded all the digital photos in as evidence.

The gun boxes contained a label from RMB enterprises. Officer Lambert assisted further by contacting the owner of RMB Enterprises, a Milpitas gun shop. Officer Lambert spoke to Blank on the telephone and asked if he had been the victim of recent commercial burglary. Officer Lambert informed him that we had several of his cardboard gun boxes with his stores name on them. Blank advised he had not been a victim and stated he frequently throws out the boxes. Officer Lambert memorialized Blank's statement via his digital recorder which was later downloaded to the FPD mainframe. Refer to his supplement for further.

The vehicle was towed by Allways Tow, at my request, per VC 14602.6. I had the vehicle entered into SVS under FCN # 1090721400832.

Officer MacDonald transported Baca to Fremont jail for booking.

I re-contacted Ana and obtained a taped statement. Ana confirmed she and Baca drove in her car to Denny's and that she never entered the green Corolla. Ana said Baca arrived in a green car and left in a green car. Ana said she had no knowledge of any firearms in the Corolla. Ana said she had no conversations with Baca about firearms. Ana said this was the first time she had ever seen Baca with this green car. Although Ana had a search clause she consented to search of her room, house and car. The search yielded negative results.

I, along with additional police personnel, conducted a parole search of Baca's listed residence. I recorded my knock notice and was met at the door by Arlene Baca (Ernest Baca's mother). I advised the reason for our search and she allowed us in and pointed to where Baca's belonging were. Arlene said Ernest had not slept at the residence in 2 months and only used the address for his parole. Arlene said Ernest frequently stops by but does not sleep there. Arlene also asked about the green Corolla. She said Ernest purchased the car on Monday from her work and she told him he needed to put the car in his name immediately. I searched his room and outdoor storage area which met with negative results.

I attempted to contact Parole Agent Enriquez (Baca's parole agent) with negative results. I did contact Parole agent Tonia Wells and she issued a PC 3056 hold on Baca. I confirmed with FPD Jail that they received the parole hold.

Based on this investigation I believe Baca deliberately locked the keys in the car to avoid having affiliation with it. I believe he lied to me about his name in an attempt to avoid being searched as a condition of his parole. I clearly observed Baca in the listed vehicle and no other persons entering or exiting. Based on the short period of time from my first and second contact (within minutes) Baca was the only person in control of the car. Baca had indicia (DMV transfer form) filled out and signed in the vehicle. Baca being a convicted felon and documented gang member makes it illegal to be in possession or control of firearms. Baca was in control of a loaded firearms located on the passenger seat and six additional firearms in the trunk. In addition 3.0 grams of suspected methamphetamine was located in the center counsel of the vehicle.

Based on this investigation I recommend this case be forwarded to DDA for charging Baca with the following: PC 148.9, VC 14601, PC 3056, PC 12021, PC 12025, PC 12031, HS 11377, and HS 11370.1.

I contacted Detective Crandall and Detective Little and advised them of this case. Due to Baca's criminal history, the amount of weapons located, it was determined that Detective Crandall and Detective Little would take over this investigation. At approximately 0630 hours I gave custody of all seven firearms to Detective Crandall. Refer to his supplement report for further.

I contacted GVS Detective Brannon and discussed this case. Detective Brannon advised me that Baca is a well known documented Irvington Norteno gang member and that he (Brannon) will also conduct follow up. Refer to

| Report Officer | Printed At | |
|---|---|---|
| 12199/MAGANA, ARMANDO | 08/07/2007  11:25 | Page  4  of  10 |

BACA-0016

**070802004**    Supplement No
ORIG

## Fremont Police Department

### Summary Narrative

Detective Brannon's supplement for further.

cc: Parole Agent Enriquez (Hayward)

**EXHIBIT A**
**TO DECLARATION OF OFFICER JASON LAMBERT**

## DECLARATION OF OFFICER JASON LAMBERT

I, JASON LAMBERT, hereby declare and state as follows:

1.     I am an Officer with the Fremont Police Department, and have been a police officer with the City of Fremont since July 1995. Since on or about March 2006, I have served as a K-9 officer. I have also served on the Fremont Police Department's Gang Task Force. I submit this declaration in support of the United States' Opposition to Defendant Ernest Pascual Baca's motion to suppress. Except where expressly stated otherwise, I have personal knowledge of the facts stated in this declaration, and if called as a witness, could and would competently testify thereto.

2.     Attached hereto as Exhibit A is a true and correct copy of Supplement 1 to the Fremont Police Department Report for report number 070802004. I authored the original portion of this report, labeled as BACA-0023 to BACA-0024  The contents of the report are true and accurate to the best of my knowledge and belief.

3.     After arriving at the scene, Officer Magana showed me what appeared to be the handle of pistol partially concealed under the seat of Defendant's car. The handle was plainly visible through the window of the car. The tow truck driver then used a "Slim Jim" to open the driver-side rear door of Defendants car  After entering the car, Officer Magana removed the handgun and handed it to me so that I could render the weapon "safe."

4.     After the removal of the handgun, but before releasing my K-9 into a car, I first examined the car for any dangerous objects or substances that might by harmful to my dog. I then released the K-9 into the passenger compartment of the car to search for additional contraband. The K-9 indicated the presence of narcotics by scratching on the center console near the dashboard.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of September, 2008, in Fremont, California.

JASON LAMBERT

**070802004**  Supplement No 0001

# Fremont Police Department



2000 Stevenson Blvd

Fremont, CA 94538

Reported Date
08/02/2007
Nature of Call
3056
Officer
LAMBERT, JASON

510-790-6800 Main Phone

510-790-6831 Fax

## Administrative Information

| Agency | | | Report No | | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|---|---|
| Fremont Police Department | | | 070802004 | | 0001 | 08/02/2007 | | 01:38 | 070067272 |
| Status | | Nature of Call | | Location | | | | | |
| REPORT TO FOLLOW | | PAROLE VIOLATION | | GLENVIEW DR/MOWRY AV | | | | | |
| City | Rep Dist | Area | Beat | From Date | | From Time | To Date | | To Time |
| Fremont | 520 | 2 | 2 2 | 08/02/2007 | | 01:38 | 08/02/2007 | | 01:38 |
| Officer | | | | | Assignment | | | | Entered by |
| 2762/LAMBERT, JASON | | | | | Mid Shift, B Team, Zone 1 | | | | 2762 |
| Assignment | | | RMS Transfer | Approved By | Approving Officer | | | | |
| Mid Shift, B Team, Zone 1 | | | Pending | 1624 | 1624 | | | | |
| Approval Date | | Approval Time | | | | | | | |
| 08/03/2007 | | 09:49:59 | | | | | | | |

## Summary Narrative

On 08/02/04 at approx. 0307 hours I responded to Glenview Drive and Mowry Ave to assist Officer Magana with a traffic stop. He requested that I use my canine for a drug/narcotic search on a vehicle after he arrested parolee Ernie Baca.

I deployed canine "Dax" into the vehicle and he indicated the presence of odor of narcotics/drugs in the area of the center console at the front of the dash by scratching. A search of the vehicle in the area around the indication yielded a medicine bottle in the center console which contained approx. 3 grams of suspected crystal methamphetamine.

I later assisted Officer Magana further by contacting the owner of RMB Enterprises, a Milpitas gun shop. I spoke to him on the telephone and asked if he had been the victim of recent commercial burglary. I informed him that we had several of his cardboard gun boxes with his stores name on them. Blank advised he had not been a victim and stated he frequently throws out the boxes. I memorialized Blank's statement via my digital recorder which was later downloaded to the FPD mainframe.

The purpose of this supplement was to document the canine's deployment and find and my contact with the owner of the gun shop. Refer to the original report for further details.

## PERSON 1: BLANK,ROB

| Involvement | Invl No | Type | | Name | | | MNI | Sex |
|---|---|---|---|---|---|---|---|---|
| PERSON | 1 | Individual | | BLANK,ROB | | | 1383644 | Male |
| DOB | | Age | Juvenile? | Sort order | | | | |
| 03/02/1961 | | 46 | No | 150 | | | | |
| Type | | Address | | | | City | | |
| Business | | 1000 JACKLIN RD | | | | Milpitas | | |
| State | | | | | | | | |
| California (Not for boat RES) | | | | | | | | |
| Phone Type | | Phone No | | Phone Type | Phone No | | | |
| Business | | (408)946-5287 | | Cellular | (408)476-0707 | | | |

## Narrative

SAME AS SUMMARY.

On 08/02/04 at approx. 0307 hours I responded to Glenview Drive and Mowry Ave to assist Officer Magana with a traffic stop. He requested that I use my canine for a drug/narcotic search on a vehicle after he arrested parolee Ernie Baca.

I deployed canine "Dax" into the vehicle and he indicated the presence of odor of narcotics/drugs in the area of the center console at the front of the dash by scratching. A search of the vehicle in the area around the indication

| Report Officer | Printed At | |
|---|---|---|
| 2762/LAMBERT, JASON | 08/07/2007 11:25 | Page 1 of 2 |

070802004     Supplement No
0001

# Fremont Police Department

## Narrative

yielded a medicine bottle in the center console which contained approx. 3 grams of suspected crystal methamphetamine.

I later assisted Officer Magana further by contacting the owner of RMB Enterprises, a Milpitas gun shop. I spoke to him on the telephone and asked if he had been the victim of recent commercial burglary. I informed him that we had several of his cardboard gun boxes with his stores name on them. Blank advised he had not been a victim and stated he frequently throws out the boxes. I memorialized Blank's statement via my digital recorder which was later downloaded to the FPD mainframe.

The purpose of this supplement was to document the canine's deployment and find and my contact with the owner of the gun shop. Refer to the original report for further details.

BACA-0024