BARRY J. PORTMAN
Federal Public Defender
NED SMOCK
Assistant Federal Public Defender
555 - 12th Street
Suite 650
Oakland, CA 94607-3627
Telephone: (510) 637-3500

Counsel for Defendant BACA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-07-0659 DLJ |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S REPLY TO UNITED** |
| | ) | **STATES' RESPONSE TO MOTION** |
| vs. | ) | **TO SUPPRESS EVIDENCE** |
| | ) | |
| ERNEST PASCUAL BACA, | ) | |
| | ) | Date:   September 26, 2008 |
| Defendant. | ) | Time:  11:00 a.m. |
| | ) | Judge: Hon. D. Lowell Jensen |

## INTRODUCTION

In its opposition brief, the government seeks to justify the warrantless seizure of Mr. Baca by minimizing the significance of an extended coercive, custodial encounter and by overstating the quantity and quality of information known to Officer Magana at the time of this encounter.  To support the warrantless search of Mr. Baca's vehicle, the government relies upon arguments that have been rejected by the Ninth Circuit Court of Appeals.  Finally, the government fails to justify the un-*Mirandized* custodial interrogation of Mr. Baca.  Defendant's Motion to Suppress should be granted in full.

1
<u>**ARGUMENT**</u>

2
**I.     Mr. Baca was Seized in the Absence of Reasonable Suspicion**

3
The first ground for suppression asserted in defendant's moving papers is that the

4
evidence was obtained as a result an unlawful seizure of Mr. Baca in the absence of reasonable

5
suspicion.   Specifically, after his initial interaction with Mr. Baca, Officer Magana exited his

6
vehicle and seized Mr. Baca without articulable suspicion that criminal activity was afoot.   The

7
government offers two justifications for Officer Magana's approach and detention of Mr. Baca.

8
First, the government contends that Mr. Baca was not seized for Fourth Amendment purposes

9
until Officer Magana handcuffed him and put him in a patrol car more than an hour after the

10
second encounter began.   Second, the government contends that even if Mr. Baca was, in fact,

11
detained at the time of his second encounter with Officer Magana, that detention was supported

12
by reasonable suspicion.   Neither argument has merit.

13
**A.     Mr. Baca was Seized During the Second Encounter with Officer Magana**

14
The government first asserts that Mr. Baca was not seized until the time that Officer

15
Magana handcuffed him.   This despite the fact that Mr. Baca was confronted and questioned

16
insistently for more than one hour before he was placed in handcuffs.   The argument is supported

17
by neither the law or the facts of this case.   In fact, Mr. Baca was seized when Officer Magana

18
exited his vehicle and confronted Mr. Baca demanding to know his identity.

19
A Fourth Amendment seizure occurs when an officer intentionally applies physical

20
restraint of a suspect or initiates a show of authority to which a reasonable innocent person

21
would feel compelled submit, and to which the subject does submit for reasons that are solely

22
related to the official show of authority. *California v. Hodari D.*, 499 U.S. 621, 624 (1991);

23
*Florida v. Bostick*, 501 U.S. 429, 436-37 (1991).   So long as a reasonable person would feel

24
free "to disregard the police and go about his business," the encounter is consensual and no

25
reasonable suspicion is required. *Hodari D.*, 499 U.S. at 628.   The Ninth Circuit has identified

26
several factors to consider in determining if a person was seized, any one of which, if present,

1    could constitute a seizure: (1) the number of officers; (2) whether weapons were displayed; (3)

2    whether the encounter occurred in a public or non-public setting; (4) whether the officer's tone

3    or manner was authoritative, so as to imply that compliance would be compelled; and (5)

4    whether the officers informed the person of his right to terminate the encounter. *United States*

5    *v. Washington*, 490 F.3d 765, 771 -772 (9th Cir. 2007).

6        Here, Officer Magana's <u>first</u> encounter with Mr. Baca did not amount to a seizure

7    because Officer Magana simply asked Mr. Baca questions about his identity from the window of

8    his police cruiser while Mr. Baca was on the sidewalk.  However, a consensual encounter can

9    transform into a seizure requiring reasonable suspicion when it becomes clear that the individual

10   is no longer free to leave.  *See United States v. Ayarza,* 874 F.2d 647, 650 (9th Cir. 1989)

11   (stating that a consensual encounter "may evolve into a situation where the individual's ability to

12   leave dissipates"); *Terry v. Ohio,* 392 U.S. 1, 18 (1968) (recognizing that "a search which is

13   reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity

14   and scope").  Although a reasonable person might have felt free to leave when routine questions

15   about identity were posed from the window of a police cruiser, it was entirely clear that Mr.

16   Baca was not free to depart once Officer Magana returned to demand further details about his

17   identity.

18       A number of factors establish that a reasonable person in Mr. Baca's shoes would not

19   have felt free to leave once this second encounter was initiated.  First, Officer Magana's

20   approach of Mr. Baca was authoritative and controlling in nature.  Officer Magana himself

21   described his action upon exiting the vehicle as "confronting" Mr. Baca about his name. *Exhibit*

22   *A to Motion to Suppress, Report of Officer Magana at 0014.*  Officer Magana accused Mr.

23   Baca of lying about his identity and demanded to know his true name. *Id.*  This is precisely the

24   type of authoritative tone and manner identified in precedent as suggesting to the target that

25   compliance is required.  Second, this encounter occurred late at night.  This fact also reflects the

26   coercive nature of the interaction and reinforces the fact that a reasonable person in Mr. Baca's

1    shoes would not have felt free to leave. *See Washington*, 490 F.3d at 773 (fact that stop

2    occurred at 11:30 p.m. and officer had to use flashlight supported conclusion that reasonable

3    person would not have felt free to terminate encounter). There is nothing in the record to

4    suggest that anyone else was out on the street. Third, Officer Magana did not inform Mr. Baca

5    during this encounter that he was free to leave. *See United States v. Patino,* 649 F.2d 724,

6    727 (9th Cir.1981), *abrogation on other grounds recognized by $25,000 U.S. Currency,*

7    853 F.2d at 1505 n. 2 (holding that an officer's failure to inform a person that he has a right to

8    terminate the encounter weighs in favor of finding a seizure). Officer Magana's conduct and

9    accusatory questioning suggested just the opposite - namely that if Mr. Baca did not provide an

10   answer about his identity that was satisfactory to Officer Magana, he would continue to be

11   detained. In other words, Officer Magana's conduct "convey[ed] a message that compliance

12   with [his] requests [was] required." *Bostick,* 501 U.S. at 435. The obvious message being sent

13   to Mr. Baca initially was that Officer Magana did not believe Mr. Baca's claim that he was Chris

14   Baca and that Mr. Baca would not be allowed to leave as long as he maintained that his name

15   was Chris Baca. This is the essence of a seizure.

16        After Mr. Baca admitted his true name, it was clear that he would not be allowed to

17   leave - if at all - until he gave the officers the key to the Toyota Corolla. Officer Magana shifted

18   his attention from getting Mr. Baca to admit that he was Ernest Baca to getting into the Toyota

19   Corolla to search it. Officer Magana searched Mr. Baca, then questioned him over a long

20   period of time about where he had been that evening, why he was driving in that area, and why

21   he did not have the keys to the vehicle on his person. *Exh. A at 0014.* Another Fremont Police

22   officer arrived on the scene and guarded Mr. Baca, who had been ordered to sit on the curb,

23   while Officer Magana went to speak with Ana Cueva. *Id. at 0015.* The arrival of another

24   officer and the fact that he was responsible for monitoring Mr. Baca while Officer Magana

25   performed additional investigation further reflects the fact that Mr. Baca was not free to leave.

26   *See, e.g., Orhorhaghe v. INS,* 38 F.3d 488, 495 (9th Cir. 1994) (citing with approval *United*

1  *States v. Bloom,* 975 F.2d 1447, 1454 (10th Cir. 1992), which held that the questioning of one

2  suspect by two DEA agents increased the encounter's coerciveness and tilted in favor of finding

3  a seizure).  An individual ordered to sit on the curb while a police officer monitors him can

4  reasonably conclude only one thing - he is not free to stand up and walk away.  It also strains

5  credulity to suggest that Mr. Baca was not seized despite the fact that more than one hour

6  passed while Officer Magana spoke with witnesses, questioned Mr. Baca, and contacted

7  dispatch.  *Exhibit B to Motion to Suppress.*  The government asserts that Mr. Baca was not

8  seized until approximately 2:42 a.m., more than one hour after Officer Magana exited his vehicle

9  to confront Mr. Baca for the second time.  *United States' Opp. at 16:27-28.*

10      In sum, Mr. Baca was seized by Officer Magana when Officer Magana exited his

11  vehicle and confronted Mr. Baca about his name in an accusatory manner.  This seizure lasted

12  more than one hour while Officer Magana tried to gain access to the Toyota Corolla.

13      **B.    The Warrantless Seizure of Mr. Baca Occurred Despite an Absence of
            Reasonable Suspicion that he was Involved in Criminal Activity**

14

15      Officer Magana had no justification for performing a warrantless seizure of Mr. Baca on

16  the night of August 2, 2007.  The Fourth Amendment requires that police have reasonable,

17  articulable suspicion that "criminal activity is afoot" before stopping a citizen.  *Minnesota v.*

18  *Dickerson*, 508 U.S. 366, 371 (1993)(citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

19  "Innocuous conduct does not justify an investigatory stop unless there is other information or

20  surrounding circumstances of which the police are aware."  *United States v. Montero-*

21  *Camargo*, 208 F.3d 1122, 1130 (9th Cir. 2000)(citing *People of the Territory of Guam v.*

22  *Ichiyasu*, 838 F.2d 353, 355 (9th Cir. 1988)).  The burden to provide sufficient facts in support

23  of  reasonable suspicion falls squarely upon the United States.  *See Brown v. Texas,* 443 U.S.

24  47, 51-52 (1979); *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion).  The United

25  States fails to meet this burden in its opposition pleadings.  At most, the government can cite to

26

1    an "unparticularized suspicion" that Mr. Baca was involved in criminal activity.[1]  None of the

2    factors relied upon by the government, taken alone or in combination, support a finding of

3    reasonable suspicion.  For example, hesitancy or uneasiness in the presence of a police officer

4    does not necessarily support reasonable suspicion.  *See, e.g., United States v. Halls,* 40 F.3d

5    275 (8th Cir. 1994) (fact that driver and passenger "avoided eye contact with state troopers"

6    when police car pulled alongside not grounds for stop); *United States v. Peters*, 10 F.3d 1517

7    (10th Cir. 1993) (Passenger's sideways glances at passing police car "are simply insufficient to

8    support a reasonable suspicion.").

9            Contrary to the government's suggestion, the defense did not in its moving papers

10    incorrectly conflate the legal standards for reasonable suspicion and probable cause in this

11    context.  The defense noted that Officer Magana did not reference any statute making it illegal to

12    provide a false name to a police officer during a non-custodial encounter.  *Motion to Suppress*

13    *at 6:9-10.*  This is relevant not because an officer must possess probable cause before

14    conducting a *Terry* stop, but because he must possess more than an "unparticularized suspicion"

15    or "inchoate hunch" that criminal activity is afoot before seizing an individual.  *Terry*, 392 U.S. at

16    8.  One way to support a finding of reasonable suspicion would be for the government to cite to

17    some law Officer Magana reasonably suspected Mr. Baca was violating.  They fail to do so.

18    **II.    The Government Fails to Assert a Valid Exception to the Warrant Requirement
         to Justify the Vehicle Search**

19

20            In its moving papers, the defense asserted a second independent ground for suppression

21    of the physical evidence in this case; namely that the search of the Toyota Corolla was

22    unsupported by any exception to the warrant requirement.  The government bears the burden of

23    proving an exception to the warrant requirement by a preponderance of the evidence.  *United*

24    *States v. Linn*, 880 F.2d 209, 214 (9th Cir. 1989).  The government offers two justifications

25    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26            [1]The government suggests that Mr. Baca had been arrested by Fremont Police several times in
         recent years, but offers no proof that Officer Magana had ever had contact with Mr. Baca.

DEFENDANT'S REPLY                          6

for the warrantless search of Mr. Baca's car.  Each justification was rejected by the Ninth

Circuit in a case decided earlier this year.  *See United States v. Caseres*, 533 F.3d 1064 (9th

Cir. 2008).  Because the government fails to meet its heavy burden of establishing that the

warrantless search of the vehicle did not violate the Fourth Amendment, the evidence obtained

during that search must be suppressed.

In *Caseres*, an officer saw Caseres make a turn without signaling and believed that the

front passenger windows were tinted in violation of a provision of the California Vehicle Code.

Soon afterwards, Caseres parked his car, got out, and walked quickly toward his home.  The

officer approached Mr. Caseres and identified himself as a police officer.  Caseres threatened

the officer, then ran before being apprehended after a foot chase.  *Id.* at 1067.  The officers then

searched Caseres' car, despite the fact that it was a block and a half away from the location

where Caseres was arrested.  The Ninth Circuit found that the warrantless vehicle search was

unconstitutional despite the government's contention that it could be justified as an inventory

search or a parole search.

**A.    The Vehicle Search Cannot Be Supported as a Parole Search**

First, with respect to the parole search, the Ninth Circuit explained that the search

condition associated with an individual's California parole validates a search "only if the police

had advance knowledge that the search condition applied before they conducted the search."

*Id.* at 1075-76.  *See also Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005) ("[P]olice

officers cannot retroactively justify a suspicionless search . . . on the basis of an after-the-fact

discovery or . . . a parole condition.").  Importantly, California Penal Code § 3067(a), which

requires inmates eligible for release to agree to be subject to a search condition, applies only to

parolees whose offense "was committed on or after January 1, 1997."  Cal.Pen.Code §

3067(c).  In other words, officers cannot simply assume that anyone they contact on the street

who is on parole is necessarily subject to a full search condition.  In *Caseres*, the record showed

that the officer was aware that Mr. Caseres was on parole before ordering the search of his

1    vehicle, but the government failed to establish when, and in what state, Mr. Caseres had

2    committed the crime for which he was paroled.  Accordingly, there was no evidence that the

3    officer was aware that Cal. Pen.Code § 3067 applied before he ordered the search.

4         Likewise, in this case the government has proffered evidence that Officer Magana

5    learned that Mr. Baca was on parole for a California robbery conviction.  However, neither

6    Officer Magana's police report or his declaration indicate that he had been provided information

7    supporting a belief that Mr. Baca had a parole search condition.  Officer Magana does not claim

8    that he was told that Mr. Baca had a parole search condition.  Neither does he claim that he

9    discovered the date of Mr. Baca's prior conviction.  Accordingly, as in *Caseres*, the evidence

10   proffered by the government does not establish that Officer Magana was aware that Cal.

11   Pen.Code § 3067 applied before he performed a warrantless search of the Toyota Corolla.

12        In its opposition brief, the government claims that by the time Officer Magana searched

13   the vehicle, he had confirmed that the terms of Mr. Baca's parole included a search condition.

14   United States' Opp. at 13:12-14.  However, the government provides no evidentiary basis for

15   this claim.  The police report  filed by Officer Magana says only that Officer Magana "confirmed

16   that [Mr. Baca] was active to parole for violation of PC 212.5(c)."  *Exh. A at 0014.*  Later in

17   the report, Officer Magana states that he conducted a search of Mr. Baca "based on a condition

18   of his parole," but he does not indicate whether or how he actually developed a reasonable basis

19   for concluding that there was a search condition.  *Id.*  Officer Magana's declaration does not

20   contain any discussion of a parole search condition.  It appears that Officer Magana simply

21   assumed that Mr. Baca must have a search condition because he was on active parole.  This is

22   precisely the assumption that was rejected by the Ninth Circuit in *Caseres*.  Accordingly, the

23   search cannot be upheld as a parole search.

24        **B.    The Search Cannot be Justified as an Inventory Search or Premised
              Upon the Inevitable Discovery Doctrine**

25

26   The government also claims that the search can be justified as an inventory search, since

the government claims that the officers were entitled to impound the Toyota Corolla because

Mr. Baca was driving with a suspended license.  Like the parole search justification, this

argument was also rejected by the Ninth Circuit in *Caseres*.

In *Caseres*, the Ninth Circuit refused to accept the government's contention that

Caseres' vehicle would have been impounded because he was being arrested for, among other

things, driving with a suspended license, and that an inventory search would have been

conducted as part of the impound procedure.  *Caseres*, 533 F.3d at 1074-75.  Specifically, the

Ninth Circuit explained that there was no community caretaking rationale for the impoundment of

Caseres' car in that case because:

> [t]he car was legally parked at the curb of a residential street two houses away
> from Caseres' home.  The possibility that the vehicle would be stolen, broken
> into, or vandalized was no greater than if the police had not arrested Caseres as
> he returned home.  The government has not presented any evidence that the car
> was blocking a driveway or crosswalk, or that it posed a hazard or impediment
> to other traffic.  Accordingly, we conclude that there was no lawful basis to
> impound the vehicle and therefore the subsequent inventory search was
> unconstitutional.

*Id.* at 1075.  Likewise, the Court of Appeals rejected the government's contention that the

vehicle could be impounded specifically because Caseres was driving on a suspended license.

The court explained that there was no community caretaking function where the unlicensed

driver was being taken into custody and there was no concern that he would simply drive off

once the officer left.  *Id.*

The circumstances here were identical.  The Toyota Corolla was parked legally on the

side of the road near the home of a person the officer believed to be Mr. Baca's girlfriend.

There has been no suggestion that the vehicle was blocking a driveway or crosswalk or posed a

hazard to other traffic.  Mr. Baca was taken into custody, so there was no risk he would use the

car to drive away after the officers departed.  Accordingly, just as in *Caseres*, there was no

lawful basis to impound the vehicle.  By extension, there was no legal basis to perform an

inventory search.

1    Furthermore, even if impounding the vehicle were appropriate, the government has failed

2  to meet its burden of establishing that the inventory search was conducted appropriately.  In

3  determining whether evidence obtained during an inventory search is admissible in federal court,

4  this Court must determine whether the search was conducted in accordance with the standard

5  procedures of the agency performing the search. *United States v. Wanless*, 882 F.2d 1459,

6  1463 (9th Cir. 1989).  The Supreme Court has upheld an inventory search that was conducted

7  in good faith, for a not-solely investigative purpose and pursuant to standardized criteria.

8  *Colorado v. Bertine*, 479 U.S. 367, 371-72 (1987).  There, the Supreme Court held that

9  "reasonable police regulations relating to inventory procedures administered in good faith satisfy

10  the Fourth Amendment." *Id.* at 371.

11    Here, the government fails to provide the Court with information about the standard

12  procedures of the Fremont Police Department.  Nowhere in the government's pleadings is there

13  any reference to a manual or particular rules setting forth the nature and scope of an inventory

14  search in the Fremont Police Department.  Instead, the government proffers only a single

15  sentence in the declaration of Officer Magana which reads: "Before a car is impounded, officers

16  conduct a routine inventory search that includes a search of the passenger compartment, the

17  trunk, and any containers contained therein." *United States' Opp., Exhibit A at ¶10.*  This

18  sentence purporting to summarize the established procedures of the Fremont Police Department

19  is insufficient to equip this Court to determine whether the search was performed consistent with

20  the procedures of the department. *See United States v. Matthews*, 32 F.3d 294 (7th Cir.

21  1994) (upholding suppression where officers testified that inventory search policy existed but did

22  not explain how often policy was invoked or how it was administered); Lafave, *Controlling*

23  *Discretion by Aministrative Regulations: The Use, Misuse, and Nonuse of Police Rules and*

24  *Policies in Fourth Amendment Adjudication*, 89 Mich.L.Rev. 442, 456-57 (1990) ("A

25  primary concern, of course, is the possibility of undetected arbitrariness, a risk which takes on

26  much greater proportions when the supposed 'standardized procedures' are established only by

1    the self-serving and perhaps inaccurate oral statements of a police officer, and are not

2    memorialized in the department's previous written instructions to its officers.").

3        For these same reasons, the government's related argument that the discovery of the

4    evidence in the vehicle was inevitable fails.  As set forth above, the government's argument that

5    impounding the vehicle was appropriate was rejected in *Caseres*.  The government has failed to

6    establish that impounding the car was justified.  Therefore, it cannot be said that an inventory

7    search conducted prior to impounding the car would have inevitably resulted in the discovery of

8    the evidence.  Because the government failed to meet its burden of establishing an exception to

9    the warrant requirement, all evidence flowing from the warrantless search of the Toyota Corolla

10   must be suppressed.

11   **III.    Mr. Baca's Statements Must be Suppressed.**

12       Although its position is not entirely clear, the government appears to contend that Mr.

13   Baca was not subject to custodial interrogation during the more than one hour that he was held

14   and questioned by Officer Magana and Officer McDonald.  This despite the fact that Mr. Baca

15   was subject to detailed, accusatory questioning, held for a long period of time by two officers,

16   was told to sit on the curb, and was never told that he was free to leave.  It is clear that Mr.

17   Baca was in custody during this lengthy period and that the questioning amounted to

18   interrogation.

19       **A.    Mr. Baca was in Custody for *Miranda* Purposes**

20       A person is in custody for purposes of *Miranda* if he has been "deprived of his freedom

21   of action in any significant way."  *Miranda* v. Arizona, 384 U.S. 436, 444 (1966).  Relevant

22   factors include "the language used by the officers, the physical characteristics of the place where

23   the questioning occurs, the degree of pressure applied to detain the individual, the duration of the

24   detention, and the extent to which the person was confronted with evidence of guilt."  *United

25   States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001) (citation omitted).

26       Here, as set forth in more detail above, Mr. Baca was held by two officers for more than

DEFENDANT'S REPLY                          11

one hour, required to sit on the curb, questioned at length in a high pressure environment, and

told repeatedly that he was not telling the truth.[2]  These factors all point to the fact that Mr. Baca

was in custody beginning when Officer Magana got out of his police cruiser and approached Mr.

Baca.

### B.    Mr. Baca Was Subject to Interrogation

Mr. Baca was asked a wide range of questions during the time he was detained by the

officers, ranging from the insistent questioning about his identity to questions about his

whereabouts that evening and his connection to the Toyota Corolla.  In its opposition, the

government suggests that the initial questions about Mr. Baca's identity and parole status did not

amount to interrogation because they are "common biographical and booking-related questions."

The government contends that Mr. Baca's responses to those questions are admissible at trial.

*United States' Opp. at 18:1-5.*  The government does not address the extensive questioning

that occurred thereafter.  It appears, then, that the government concedes that the subsequent

questioning did, in fact, amount to interrogation.

Interrogation occurs upon "express questioning" by the police or if police use "any

words or actions . . . [that they] should know are reasonably likely to elicit an incriminating

response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes

omitted).  It is true that asking a defendant his name, birthdate, address and the like ordinarily

does not amount to interrogation because police officers typically have no reason to believe a

suspect will incriminate himself by answering such questions. *See, e.g., Pennsylvania v. Muniz,*

496 U.S. 582, 598-600 (1990); *see also United States v. Perez,* 776 F.2d 797, 799 (9th

Cir.1985) ("Routine gathering of background biographical data does not constitute interrogation

sufficient to trigger constitutional protections.").  "When a police officer has reason to know that

_____

[2]It is difficult to comprehend why the government would characterize the more than one hour
that passed between Officer Magana's approach of Mr. Baca and the time he was placed in handcuffs
as "brief."  *United States' Opp. at 16:25-26.*

1  a suspect's answer may incriminate him, however, even routine questioning may amount to

2  interrogation.  *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993).

3      Here, Officer Magana claims that, after Mr. Baca identified himself as "Chris Baca", he

4  realized that the person to whom he had spoken was in fact Ernest Baca.  Officer Magana knew

5  that giving false identifying information to a police officer can be a violation of California Penal

6  Code § 148.9.  *Exh. A at 0014.*  Therefore, this was the rare case where asking what might

7  otherwise be permissible biographical questions would likely elicit an incriminating response.

8  Similarly, all of the subsequent questioning of Mr. Baca was aimed at probing Officer Magana's

9  suspicion that the vehicle Mr. Baca was driving was stolen.  *Id. at 0015.*  Because these

10  questions were investigatory and aimed at gathering evidence about a possible vehicle theft, they

11  should have been preceded by a *Miranda* warning.  Because Mr. Baca was not *Mirandized*, all

12  statements must be suppressed.

13                      **<u>CONCLUSION</u>**

14      For the foregoing reasons, this Court should suppress all evidence recovered in the

15  search of the Toyota Corolla, as well as the statements made by Mr. Baca while he was in

16  custody.

17
    Dated: September 12, 2008

18                              Respectfully submitted,

19                              BARRY J. PORTMAN
                                Federal Public Defender
20
                                /s/ Ned Smock
21
                                NED SMOCK
22                              Assistant Federal Public Defender

23

24

25

26

DEFENDANT'S REPLY                13