United States of America,     )
                               )
              Plaintiff,       )
                               )
     v.                        )
                               )    No. CR-07-0659-DLJ
Ernest Pascual Baca,           )
                               )    **ORDER**
              Defendant.       )
_____)

On August 8, 2008, defendant Baca filed a motion to suppress any statements he made to the police, as well as any evidence seized from his car. On September 26, 2008 this Court held a hearing on the matter. Attorney Wade Rhyne appeared on behalf of the United States and defendant was represented by Attorney Edward Smock. The parties did not request an evidentiary hearing. Having reviewed the papers and having heard oral argument on this matter, the Court finds the following.

**I. BACKGROUND**

    A.    <u>Factual Background & Procedural History</u>

On August 2, 2007, Fremont Police officers arrested Ernest Baca. A search of his car turned up a small amount of drugs and several firearms. Counsel for defendant moves to suppress these items and any statements made by defendant. The following summary of the events is drawn from a declaration by Baca, declarations of the officers on the scene, and the police reports provided in discovery. Baca does not concede the accuracy of the police reports or the police declarations.

At approximately 1:32 a.m. on August 2, 2007, Fremont Police Officer Armando Magana, who was driving in a marked

1   patrol car, noticed a green Toyota Corolla stopped at a stop
2   sign for what he perceived to be a long time. *Exhibit A, Report*
3   *of Officer Magana* at 0014. After the vehicle started up and
4   turned, Magana ran a check on its license plate, which came
5   back clear. The vehicle pulled to the side of the road and
6   parked about 50 yards north of Mowry Avenue. Ernest Baca got
7   out of the driver side and began walking toward the sidewalk.
8   *Id.*

9   Officer Magana believed that he recognized Baca from a
10  previous contact. He drove up, stopped his vehicle, rolled down
11  the passenger side window, and asked Baca if he was related to
12  Greg Lopez. The officer then asked what Baca's name was, and
13  Baca told Magana that his name was "Chris Baca." When asked,
14  Baca said that he had a valid drivers license and was not on
15  probation. All of this information turned out to be false.
16  Baca told Magana that he was going to visit his girlfriend, Ana
17  Cueva, at the corner of Mowry and Glenview. Magana ended the
18  contact and drove away. *Id.*

19  Officer Magana reports that as he drove off, he remembered
20  that the person he had just spoken with was actually Ernie Baca
21  and he believed that Baca was a Norteno gang member. The
22  government's papers also state that at this point, prior to
23  speaking with Baca a second time, Magana remembered that Baca
24  was on parole.  As support for this proposition, the government
25  has presented a declaration from the Officer.  This statement
26  does not appear in the contemporaneous police report made by

Magana.[1]

Magana turned around and drove back to find Baca. Several minutes after the first contact, Officer Magana encountered Baca at the northeast corner of Mowry Avenue and Glenview. Magana got out of his vehicle, approached Baca, and confronted him about his name. Baca continued to maintain that his first name was "Chris." When Officer Magana insisted that he recognized Baca to be Ernie Baca, Baca relented. Officer Magana requested backup, and Officer Travis Macdonald arrived at the scene. *Id.*

Officer Magana then pat-searched Baca, but did not find anything. Magana reports noticing during this search that Baca did not have car keys with him. Id. Magana then had Baca sit on the curb and questioned him about where the keys to the vehicle were and where he had been earlier that night. *Exhibit C, Declaration of Ernest Baca* at ¶ 2. Magana reports that Baca told him that he had gone out to Denny's with Ms. Cueva, and that he had returned to her home because he left his cell phone in her car. Baca reported that he gave the keys to the Corolla to Cueva and that he planned on leaving the car with Cueva because her family was interested in buying the car. *Exh. A* at 0015.

---

[1] In the police report, Magana states that he knew Baca was lying about his name. As to Baca's parole status, the report indicates that Baca told Magana that he was on parole in the second conversation. Magana then confirmed Baca's status with a record check, learning that Baca was on parole for violation of Cal. Penal Code § 212.5(c) and that his license was suspended.

3

Officer Magana's report indicates that at this point Magana began to believe that the Corolla might be stolen. While Officer Macdonald stood by Baca, Magana located Ana Cueva and spoke with her. Cueva confirmed that she and Baca had been at Denny's earlier, but reported that she did not have the keys to the car. Id. Baca asked her to remember that he had given the keys to her, but she continued to state that he did not.

Officer Magana then called the Sisters of the Holy Family Convent, which was the registered owner of the vehicle. He learned that Baca's mother worked at the convent and that the vehicle was not stolen. Officer Magana then placed Baca under arrest for violation of California Penal Code § 148.9, which makes it a misdemeanor to falsely represent oneself to a peace officer upon a lawful detention or arrest, and for driving with a suspended license pursuant to California Vehicle Code § 14601. *Id.*

At this point, Magana handcuffed Baca and placed him in the patrol car. The initial contact with Mr. Baca occurred at about 1:32 a.m. The officers called for a tow truck at approximately 2:42 a.m. Exh. B. To the Motion to Suppress. Officer Magana states in his report that before the tow truck arrived, he looked into the car from outside and saw what appeared to be the keys to the car on the driver's side floor board. He also reports that he also saw having seen what appeared to be the handle of a handgun underneath the passenger seat. *Exh. A* at 0015. Baca has submitted a declaration in which he questions these assertions. Baca says in his declaration

4

1  that he doubts that Magana saw any keys as Magana continued to
2  question him about the whereabouts of the keys and also to look
3  around the car and in the bushes.  Nor did Magana mention
4  anything about seeing a gun either to Baca or in Baca's
5  presence.
6      A tow truck arrived.  The officers on scene sent the tow
7  truck driver back to get a slim jim to open up the locked
8  vehicle. *Id.* The tow truck driver returned and was able to open
9  one of the doors to the vehicle. Instead of entering and
10 searching the vehicle at this time, the officers waited for a
11 canine unit to arrive. *Id.* at ¶4.   Officer Lambert, a K-9
12 officer, arrived with his dog at approximately 3:07 a.m. to
13 assist in the search of the vehicle. Officer Magana reports
14 that he then searched the car and found a handgun under the
15 passenger seat. He further reports that the dog then searched
16 the car and indicated the odor of narcotics in the area of the
17 center console, where officers found a bottle with a clear bag
18 containing a small amount of methamphetamine. *Id.* In the trunk,
19 Officer Magana located three rifles and three shotguns in
20 boxes.

21 **II. Legal standard**

22     The Fourth Amendment protects individuals from
23 "unreasonable searches and seizures." U.S. Const. Amend. IV.
24 According to the Supreme Court, there are three types of
25 police-citizen encounters: (1) consensual encounters which do
26 not implicate the Fourth Amendment, see e.g. Michigan v.
27 Chesternut, 486 U.S. 567, 574-76 (1988); INS v. Delgado, 466
28

5

1  U.S. 210, 218-219 (1984); (2) investigative detentions which
2  are Fourth Amendment seizures of limited scope and duration and
3  must be supported by a reasonable suspicion of criminal
4  activity, see e.g., United States v. Sokolow, 490 U.S. 1 , 7
5  (1989);1, 392 U.S. 1, 30 (1968); and (3) arrests, the most
6  intrusive of Fourth Amendment seizures and reasonable only if
7  supported by probable cause. See e.g, Hayes v. Florida, 470
8  U.S. 811, 815-16 (1985); Dunaway v. New York, 442 U.S. 200,
9  212-16 (1979).

10  A consensual encounter "may evolve into a situation where the individual's ability to leave dissipates." United States v. Ayarza, 874 F.2d 647, 650 (9th Cir.1989)

### III. **Discussion**

The Court must now decide whether any of the encounters between Baca and the police before he was placed under arrest was a detention, and if so, did the police have reasonable suspicion. The Court must also decide whether the physical evidence was seized lawfully.

A. The first encounter

It is clear that there are no fourth amendment implications to Baca's first conversation with Officer Magana. At that point, Magana remained in his cruiser with no lights flashing or sirens on and merely spoke with Baca through the passenger side window.

B. The Second Encounter

Defendant asserts that his second encounter with Officer

6

Magana was transformed into a seizure as Baca did not feel free to leave. It is well established that the Fourth Amendment is not implicated when law enforcement officers merely approach an individual in public and ask him if he is willing to answer questions. See Muehler v. Mena, 544 U.S. 93 (2005); see also Florida v. Royer, 460 U.S. 491, 497 (1983); United States v. Mendoza-Cepeda, 250 F.3d 626, 628 (8th Cir.2001). No Fourth Amendment seizure occurs when a law enforcement officer merely identifies himself and poses questions to a person if the person is willing to listen. See Royer, 460 U.S. at 497; see also Orhorhaghe v. INS, 38 F.3d 488, 494 (9th Cir.1994). This is true whether an officer approaches a person who is on foot or a person who is in a car parked in a public place. See United States v. Kim, 25 F.3d 1426, 1430 (9th Cir. 1994). Moreover, it is clear that the permissible questions may include a request for consent to search, see Muehler, 544 U.S. at 101, "as long as the police do not convey a message that compliance with their requests is required." Bostick, 501 U.S. at 435.

A consensual encounter can transform into a seizure requiring reasonable suspicion when a reasonable person would not feel free "to disregard the police and go about his business." California v. Hodari D., 499 US 621,624 (1991). Factors identified by the Ninth Circuit in assessing whether a reasonable person would feel free to leave are: (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public setting; (4) the tone and

7

manner of the officer; and (5) whether the officers informed the person of his right to terminate the encounter. United States v. Washington, 490 F.3d 765, 771-772 (9th Cir. 2007).

In this case there are no allegations that weapons were displayed. The encounter occurred in a public setting. While defendant describes Magana's demeanor as "authoritative" and "controlling" in nature there is no evidence that Officer Magana raised his voice or used an otherwise threatening tone with Baca. Defendant puts great store in the fact that Magana accused him of lying about his name, but Baca was in fact lying about his name –so in and of itself this factor does not seem dispositive. Similarly, defendant points to the fact that the encounter happened late at night as cooercive, but the encounter would not have occurred late at night but for Baca being out on the street late at night.

A finding of no seizure at this point is consistent with the Ninth Circuit's holding in United States v. Washington, 490 F.3d 765, 771-772 (9th Cir. 2007) "In sum, officer Shaw was entitled to question Washington for investigatory purposes, and the mere asking of questions, including asking for permission to search Washington's person, raised no Fourth Amendment issue so long as a reasonable person in Washington's situation would have felt free to leave.")

After his initial discussion with Baca where Magana made it clear that he knew Baca was lying about his name, Magana continued to question Baca about the absence of keys for the car. At some point shortly thereafter another Fremont police

8

officer arrived on the scene and the police instructed Baca to sit on the curb while the second officer stood by Baca. Defendant cites Washington, Id. at 771-772, as analogous to this situation, and in fact, it is fairly close on the facts once the second officer arrives on the scene.

In Washington, defendant, was sitting in the driver's seat of his lawfully parked car, a Ford Taurus. Police officer Shaw saw Washington sitting in the car, did not suspect Washington of any crime, but decided to make contact to investigate. Without activating his sirens or lights, Shaw parked his squad car a full car length behind Washington's car. Shaw approached Washington's car on the driver side and shined a flashlight into the car. Shaw was uniformed, and his baton and firearm were in plain view of Washington, but remained holstered throughout the encounter.

A conversation between Shaw and Washington ensued. Washington consented to Shaw's search of his person. Shaw asked Washington to step out of the car. Although Shaw spoke cordially and did not use any threat of force, Shaw directed Washington to move away from his car until the two reached Shaw's squad car, a full car length away. Once there, Shaw searched Washington's person.

While Washington was exiting his car, a second officer arrived at the scene. This officer heard Shaw ask Washington to step out of the car and noticed that when Washington exited his car, Washington's hands were raised. The second officer blocked Washington's entrance back into his car. The Ninth

9

Circuit held that on these facts, Washington had been seized at that point in the encounter.

Consistent with Washington, once Baca was instructed to sit on the curb with another officer watching over him, a reasonable person in Baca's situation would not feel free to simply walk away and therefore at that point Baca could be considered "seized."

The issue for the Court at this point where Baca had been seized, is whether or not the police had reasonable suspicion that "criminal activity may be a foot" as of that time. Terry, 392 U.S. at 30. Defendant argues that reasonable suspicion must be more than an "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27. Defendant further argues that "innocuous conduct does not justify an investigatory stop unless there is other information or surrounding circumstances of which the police are aware." United States v. Montero-Camargo, 208 F.3d 1122, 1130 (9th Cir. 2000)(citing People of the Territory of Guam v. Ichiyasu, 838 F.2d 353, 355 (9th Cir. 1988)). The burden to provide sufficient facts in support of reasonable suspicion falls upon the United States. See Brown, 443 U.S. at 51-52; Florida v. Royer, 460 U.S. 491, 500 (1983)(plurality opinion).

As to the second encounter, Defendant argues that at this point Officer Magana's only articulable suspicion about Baca was that he had falsely identified himself, which defendant argues, in this circumstance was not a crime. See California Penal Code § 148.9 (person who falsely represents or identifies

10

himself or herself as another person or as a fictitious person to any peace officer. . . . upon a lawful detention or arrest of the person, either to evade the process of the court, or to evade the proper identification of the person by the investigating officer is guilty of a misdemeanor). Whether or not this conduct is itself criminal, however, does not change the fact that the conduct can be considered as part of the totality of circumstances underlying the issue of reasonable suspicion.

The government contends that the factual record supports a finding by the Court that Officer Magana had reasonable suspicion to detain Baca. According to the government, before initiating the investigatory detention, Officer Magana made a number of visual observations in addition to Baca's false statement there are:(1) Baca remained stopped at a stop sign for a long period of time even though there was no traffic in either direction of the intersection; (2) the car Baca had been driving was registered to a convent of Nuns, raising in Magana's mind a suspicion that the car had been stolen (3) as soon as Magana arrived at the intersection, Defendant pulled to the side of the road, parked the car, got out of the car, and began to walk away from the area; and (4) although he had just left the car, he did not have the keys to the car.

The government asserts that while these events might seem innocuous to a lay person, they were significant to Magana because it appeared that immediately after spotting the police car, Baca made a deliberate attempt to avoid police contact and

11

to distance himself from the Toyota Corolla. The government argues that based on his training and experience, Magana believed that Defendant's actions were indicative of someone who was engaging in some form of criminal activity. All of the factors listed above, combined with Baca's clear lies about his identity and his parole status, his presence on the street late at night and his known Norteno gang affiliation combined formed the basis for reasonable suspicion that defendant intended to conceal some form of criminal activity common among gang members-such as narcotics, weapons, and/or street violence. The Court concurs that under the totality of the circumstances and given the officer's experience, the government has met its burden of articulating reasonable suspicion for the detention that occurred at that time. Therefore, the Court finds no reason to suppress Baca's statements to the police.

    C.   <u>Search of the Vehicle</u>

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973)(citing <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967); <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 454-55 (1971). The search of an automobile must be supported by probable cause unless some other Fourth Amendment exception applies. <u>Chambers v. Maroney</u>, 399 U.S. 42, 51 (1970). Here, the Fremont police officers had no warrant to enter or search Baca's legally

12

parked vehicle. The search was therefore presumptively illegal. See Katz, 389 U.S. 347. "Any exception to the Fourth Amendment warrant requirement must be proven by a preponderance of evidence, and this burden is upon the government." United States v. Linn, 880 F.2d 209, 214 (9th Cir. 1989) (emphasis added). If the government fails to meet this burden, all evidence flowing from the warrantless search must be suppressed.

The government contends that the search of Defendant's car was constitutionally permissible: (1) as a parole search; (2) as an inventory search, or (3) under the inevitable discovery doctrine.

1. Parole Search

Courts have recognized that probationers and parolees have a reduced expectation of privacy by virtue of search conditions imposed on them as a result of their probation or parole status, and that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." Samson v. California, 547 U.S. 843 (2006). While it is true that under California law, inmates who are eligible for release on state parole "shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause" such a search condition requires the police to have advance knowledge that the search condition applied before they conduct a search. By the time Officer Magana searched Defendant's car, he had confirmed that

13

Defendant was then on active parole with the State of California. The government further asserts that Magana knew that the terms of Defendant's parole included a search condition. However, California Penal Code § 3067(a), which requires inmates eligible for release to agree to be subject to a search condition, applies only to parolees whose offense "was committed on or after January 1, 1997." Cal.Pen.Code § 3067(c). In other words, officers cannot simply assume that anyone they contact on the street who is on parole is necessarily subject to a full search condition.

The case of <u>U.S. v. Caseres</u>, 533 F.3d 1064 (9th Cir. 2008) is controlling on this point. In <u>Caceres</u>, an officer patrolling in Los Angeles in an unmarked police car observed Caseres driving without signaling, which the officer believed to be a violation of California Vehicle Code § 22108. He also noted that Caseres's front passenger compartment windows appeared to be tinted in violation of California Vehicle Code § 26708. The officer followed Caseres's car while he requested a warrant check from dispatch. Caseres parked his car two houses away from his residence and immediately exited his car and walked quickly toward his home. The officer caught up with Caseres on a residential front lawn. A discussion between the officer and Caceres ensued with Caseres threatening the officer. After arresting Caceres for threatening him, the officer searched the passenger compartment of Caseres's car, seizing a gun and thirteen rounds of ammunition. Caceres moved to suppress the evidence obtained in the search. The

14

government responded in part by arguing that the search was a valid parole search. The Ninth Circuit rejected this contention finding that the "search condition is limited in its application, however. The search condition validates a search only if the police had advance knowledge that the search condition applied before they conducted the search." Id. at 1067. See also, Samson v. California, 547 U.S. 843, 856 n. 5, (2006); Moreno v. Baca, 431 F.3d 633, 641 (9th Cir.2005) ("[P]olice officers cannot retroactively justify a suspicionless search ... on the basis of an after-the-fact discovery of ... a parole condition.".

Similarly, there is no dispositive evidence before the Court as to whether Officer Magana knew that Baca was subject to a search condition or that he simply assumed that Baca must have a search condition because he was on active parole, an assumption that was rejected by the Ninth Circuit in Caseres. It may be that Magana knew of other circumstances that would support a conclusion that Baca's parole was based on a crime committed by Baca sometime within the last eleven years, but they are not in the record. Accordingly, on this record, the Court rejects Baca's parole status as providing a legal basis for the search.

   2.   Inventory Search

The government argues in the alternative that the search of Defendant's car was a permissible inventory search. California Vehicle Code section 14602.6 provides that, "[w]henever a peace officer determines that a person was

15

driving a vehicle while his or her driving privilege was suspended or revoked . ..the peace officer may [ ] immediately arrest that person and cause the removal and seizure of that vehicle . . . ." Cal. Veh. Code  14601.6. A lawfully impounded vehicle may be inventory searched for the purpose of determining its condition and contents. Anything observed in the vehicle during the inventory search is admissible against the defendant. The government argues that it would have been unreasonable for the officers to leave Defendant's car on the street in the middle of the night when they knew it contained a visible firearm, therefore the towing and search were appropriate.

The defendant tries to raise uncertainty about Officer Magana's plain view search of the passenger compartment.  While Magana has stated that he observed the handle of the handgun underneath the passenger seat of defendant's car, defendant disputes that a firearm was visible.  The total basis for this dispute is Baca's declaration in which he states the opinion that Magana never saw a gun because if he had he would have mentioned it to Baca and he did not do so. Based on his dispute over whether Magana saw a gun, Baca argues that impounding the car, which was safely parked, was impermissible under Caseres, which held that the police should not have towed a car where there was no community caretaking rationale for the impoundment of the car which was legally parked at the curb of a residential street two houses away from defendant's home.

A firearm was actually found on the floorboard of the car

16

and the Court sees no reason to give more credit to the opinion of Baca than the statement of percipient witness Magano who says he could see the handle of that firearm from outside the car. Moreover, this was a car that Baca did not own, driven unlawfully by him, and left by him with the keys in the car at a location with no proximate relationship to Baca's address. The Court finds that there is an obvious caretaking rationale for this car to be taken into police possession and towed away. The Court finds that the removal of the car and the consequent inventory search were lawful.

## IV. Conclusion

Based on its findings that the police officers had reasonable suspicion to detain defendant and also that because there was a clear community caretaking rationale for towing this car partly because there was a gun visible in the car, the police were correct to tow the car. Accordingly, the Court holds that any statements by Baca and evidence found in the car were legally obtained and the Motion to Suppress is DENIED.

IT IS SO ORDERED.

Dated: October 15, 2008

D. Lowell Jensen
United States District Judge

17